## Case No. 14,402.

UNION TRUST CO. v. ST. LOUIS, I. M. & S. R. CO.

[4 Dill. 114; [1] 4 Cent. Law J. 585.]

Circuit Court, E. D. Missouri.   June, 1877.

RAILROAD COMPANIES—APPOINTMENT OF RECEIVERS—WHEN MADE.

1. A court of equity will not appoint a receiver of a railroad merely upon a showing that there has been a default in the payment of interest, secured by a mortgage of the properties and

---

2 [From 7 Chi. Leg. News, 33.]

3 [From 7 Chi. Leg. News, 33.]
1 [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

income of the company, that upon such default the trustees under the mortgage were entitled to immediate possession, that they have demanded possession, and that the same has been refused. It is necessary, in addition to this, to show that ultimate loss will happen to the beneficiaries under the mortgage by permitting the property to remain in the hands of its owners until final decree and sale, if such decree and sale be made.

[Cited in Morgan's Louisiana & T. R. & S. S. Co. v. Texas Cent. Ry. Co., 32 Fed. 532; Pennsylvania Co. v. Jacksonville, T. & K. W. Ry. Co., 5 C. C. A. 53, 55 Fed. 136; McGeorge v. Big Stone Gap Imp. Co., 57 Fed. 271.]

[Cited in Schreiber v. Carey, 48 Wis. 213, 4 N. W. 124.]

2. The facts in this case examined, and *held* not to exhibit such danger to the bondholders as will warrant the appointment of a receiver. The case of Williamson v. New Albany Railroad Co. [Case No. 17,753] followed.

This was an application by the complainant, the trustee in a railway mortgage, for the appointment of a receiver. The material facts appear in the opinion of MILLER, Circuit Justice. The arguments were heard, at chambers, in Keokuk, May 31 and June 1, 1877.

Henry Hitchcock and John W. Noble, for plaintiff.

Glover & Shepley and Thoroughman & Warren, for defendant.

Before MILLER, Circuit Justice, and DILLON, Circuit Judge.

MILLER, Circuit Justice. The plaintiff is trustee in a mortgage made by the defendant to secure the payment of $28,000,000 upon six hundred and eighty-six miles of railroad and its appurtenances, and some two or three million acres of land. Of these bonds only about three millions of dollars have been issued, and more than half of these are the property of Baring Bros. & Co., whose interests in the matter are in the hands of S. G. & G. C. Ward. The mortgage was executed and the bonds dated May 6th, 1874. It contained all the usual stringent covenants of a railroad mortgage—among others, an authority to the trustee to take possession of the mortgaged property, which included the income of the road, upon the failure to pay any installment of interest when it fell due, and, after three months of continued default in such payment, to advertise and sell the whole property, rights, and franchises of the company

Plaintiff having filed a bill in the circuit court of the United States for the Eastern district of Missouri, to foreclose this mortgage, at the same time gave notice to the defendant of an application to a judge of that court, at chambers, for the appointment of a receiver. This motion is now before us for a decision, upon the bill and the answer of defendant, which has been filed meantime, and upon numerous affidavits on both sides. We have been aided by full argument from able counsel, and propose now to state, very briefly, the decision of that motion, and the

reasons which have governed us in making it.

It is not denied by the answer that there was a failure to pay in full certain coupons of interest falling due at various times between the month of October, 1876, and the time of filing the bill in this case. Nor is it denied that early in April last, on the failure to pay certain coupons then due, a formal demand was made by complainant of the defendant for possession of the road, which was refused. And it is insisted by counsel for plaintiff, that the failure to pay these installments of interest, and to deliver possession of the road on demand, leaves, under the covenants and conditions of this mortgage, no discretion in the court to refuse to place the road in the hands of a receiver—that because the income of the road is pledged by the mortgage for the payment of the bonds, and the plaintiff is authorized, on failure to pay any installment of interest, to take possession; these circumstances, with a conceded default, without reference to the showing of the defendant, without regard to its resources, with no danger of ultimate loss to any bondholders or of any serious delay of payment, require, as matter of law, that the court must dispossess the defendant by the appointment of a receiver to take possession of the property of the company. Whether this is a sound principle or not, is the first question we are to decide. The argument is much pressed that the contract is plain that on failure to pay, the trustee is authorized to take possession, and since possession has been refused, it is the duty of the court to enforce the contract specifically.

If the contract contemplated any very protracted tenure of this possession by the trustee, as, for instance, during the forty years which the bonds have to run before maturity, and a bill were filed looking mainly to the specific enforcement of this part of the contract, equity might be bound to do so. But that is not this case. The possession can, by the terms of the contract, be only temporary, and is auxiliary to other and more important relief. If the default continues for three months, the trustee in possession is bound to advertise and sell the property, so that his possession under the contract can be but for a short time, and is only to enable him to sell and deliver the property, and take care of it in the meantime. The frame of the present bill is very different from this. It abandons the right of foreclosure by a sale by the trustee, and seeks the regular and safer mode of the chancery court. It does not ask that plaintiff be put into possession as of right belonging to the trustee, but that a receiver, plaintiff or any one else, take possession, as the officer of the court. It is plain that any receiver we may appoint is our officer, amenable to the orders of the court, responsible to it for all he does, and completely under its control, his authority resting in the appointment of the court, and not

in the contract of the mortgage deed. Hence he cannot sell the road as required by the morgage, but such sale, if made, is by decree of the court; nor can he pay the overdue coupons to the bondholders without an order from the court. This is no specific perform-ance of that contract for possession, and no such relief is prayed in the bill.

It is also said that the income of the road mortgaged to plaintiff can be secured in no other way than by appointing a receiver, and perhaps this is the surest mode of effecting that purpose. But the income is no more mortgaged than the visible property and the franchises of the company, and, unless there is danger of loss to the bondholders, there is no more reason why the income should be se-questrated than the other property of the company. It is also in the power of the court, without appointing a receiver, to re-quire of the defendant to render account of the income, and, after payment of the neces-sary expenses, to pay so much as rightfully should be paid to the debt secured by the mortgage. On this branch of this case, some language used by the supreme court in the late case of American Bridge Co. v. Heidel-bach, 94 U. S. 798, is supposed to sustain the ground taken by complainant. In that opin-ion the court was arguing the proposition that, though the income of a bridge company was mortgaged to secure its bonds, that in-come might be seized by attachment in favor of others, even pending a suit to foreclose the mortgage, where the mortgagee had taken no steps to appropriate or secure the income. And it is said that, among other modes of preventing this, was the appointment of a re-ceiver. This was predicated of a proper case for the appointment of a receiver, and, though stated by way of illustration it was not in-tended to convey the idea that a receiver was the only mode, or that his appointment was to follow in every case of foreclosure where the income was mortgaged.

The usual legal remedies to obtain posses-sion were open to the plaintiff, besides an action for damages for refusing to deliver; and though these may be inadequate, that does not constitute an imperative reason why a court of equity should become active in specifically enforcing a contract which is in its nature a forfeiture of the most strin-gent character.

We are not of opinion, therefore, that a court of equity is bound in every such case, on failure to pay, to appoint a receiver, without considering other circumstances which have a proper bearing on the question of appointment.

Treating the case as one in which the court must exercise a sound discretion on all the facts before us, we must inquire a little more at length into those facts.

The St. Louis, Iron Mountain & Southern Railway Company owes its existence to the consolidation of several other railroad com-panies, which it absorbed, and its road was largely built before the present defendant had a corporate being. Each of the four companies which became so consolidated had heavy mortgages on the pieces of road which it brought into the combined corporation; and the main purpose of the mortgage under which plaintiff is proceeding was to convert these various mortgage debts into one debt and one mortgage, by exchanging the bonds of this new company, secured by the new mortgage on the whole road and all its prop-erty, for the bonds issued by the several companies, secured by mortgages on the sev-eral parts of the road. For this purpose, twenty-one millions of dollars of these bonds were set apart, to be exchanged for the old bonds, which amounted to that sum.

The new mortgage bound the new com-pany to pay the old bonds, if not exchanged, and to pay the interest promptly on these bonds as it fell due; and a failure to do this was ground for the trustee to enter and take possession, as well as a failure in regard to the new bonds. This part of the programme was a complete failure, as less than two mil-lions of the old bonds have been exchanged for new, after three years of that offer. It became apparent, very soon after the mort-gage was made, that the company could not complete its road to its terminus, at Texar-kana, Arkansas, where it was expected to unite with the Texas system of railroads, and pay the interest on its bonded debt, and an arrangement was made by which the interest coupons on all old bonds, and the new (except, perhaps, those on one part of the old road), for two years to come, were to be funded and the company relieved from the burden of the interest, temporarily. This carried them past October, 1876. In the making of this arrangement Baring Bros. & Co. were largely consulted, and its success was mainly due to their exertions.

During these two years the road was com-pleted to Texarkana, the floating debt was considerably reduced, and the gross income, as well as the net income, increased more or less every year In the autumn of 1876, when the first coupons of interest were soon to fall due, not embraced in those to be funded, an examination of the resources of the company showed that they would not be able to pay, out of the regular net income of the road, those coupons as they would fall due through that autumn and the next year.

The agents of Baring Bros. & Co., Messrs. S. G. & G. C. Ward, who had been very in-fluential in the management of the road, having also in effect two members in the board of directors, were again freely consult-ed, and their advice followed, against the views of the president and vice-president of the company. These views were that the company should borrow what money it need-ed above the net income to pay these cou-pons, and they alleged that the credit of the company was so good at its home office, in St. Louis, that they would have no difficulty

in borrowing the necessary sum. They said that the interest to be paid during the year was about $1,600,000, and the net income would be about $1,300,000; and the difference could be borrowed and carried until the company, whose business was increasing, would enable them to pay the interest steadily. They said that the funded debt for interest had several years yet to run, and that the floating debt was easily within their control. They make affidavits now to their belief in the truth of these statements.

The Messrs. Ward did not concur in this view. They said there were deficiencies not noted by the president and vice-president, and mistakes in calculation, both as to existing net income and as to their hopes of the future, which would make the failure in the end more severe and more disastrous. In this divergence of views, two plans were suggested, viz.: By the president and vice-president of the company, that the coupons soon coming due to themselves and to Baring Bros. & Co. should not be presented for payment, while all others should be paid in full; and by Messrs. Ward, that half of each coupon presented should be paid, relying on the leniency of the holders for such extension of time for the other half as should be necessary or useful.

Which of these plans was first presented, and which was the counter-project, is not very well seen; but it is very clear that, against the views of the president and vice-president, the plan of Messrs. Ward prevailed, and was acted on. All, or very nearly all, the coupons falling due prior to April 1st, 1877, were presented; half the amount due on each was paid, was accepted and indorsed on the coupons, without objection, so far as is shown, on the part of the holders.

Without any notice of change of purpose, as is sworn by the officers of the company, the coupons for the April interest of Baring Bros. & Co. were offered for payment, and the payment of half on each, though tendered, was refused, and within forty-eight hours the present complainant made demand for possession of the road under the mortgage, and that being refused, the present bill was filed immediately, and the application made for the appointment of a receiver.

The bill and the affidavits of the complainants state that the company is hopelessly insolvent; that its property is insufficient to pay its debts; that there is danger that the prior divisional mortgages will be foreclosed on the separate pieces of road which they cover; that in this way a road which, as a whole, may be valuable, will be rendered no security at all for the debt of the Baring Bros. & Co., at whose request this foreclosure was commenced; and that the income of the road, which they are entitled to have appropriated to the payment of their interest, will be diverted to the payment of a floating debt, on part of which the directors of the company are personally liable. No allegation is made of past or present mismanagement of the company or its finances; no dishonesty or fraud is charged, and no misappropriation of the funds of the company

The answer of the defendant, supported by numerous affidavits, controverts all or nearly all these assertions of plaintiff. They say that the road itself is now yielding a net income of six per cent on $28,000,000, while its entire debt hardly reaches $26,000,000; that, prior to the unreasonable and unexpected attack of the Messrs. Ward, its credit was so good as to enable it to carry its burden without serious difficulty until the income would be ample to pay its interest, its floating debt, and current expenses; that the road is just on the point of reaping the benefit of its completed connections with other roads, east and west; that besides the road, its rolling stock and appurtenances, the company own lands, subject to the mortgage, to the value of $8,000,000, which is apart from the road, whose value, estimated by its net income at six per cent per annum, is $26,000,000. They show that the income of the road has steadily increased during the last four years, so disastrous to railroads generally, and that this is true of the net as well as the gross income.

In this conflict of evidence we must exercise the best judgment we can in its consideration, for it is a matter of which we can know nothing personally. Some things are, however, beyond dispute. It is true that both the gross and net income have steadily increased. It is true that the net income now amounts to six per cent per annum on a valuation of $26,000,000, which is about equal to all the indebtedness of the corporation. It is true that there are about two million acres of land unsold, the average value of those sold being $3.50 per acre; and, above all, it is true that the road has been recently finished to points connecting it with the whole system of Texas railroads, and opening up the shortest line for the great cattle trade of that state to its best market. It is also beyond dispute, as shown by affidavits of bank officers, that the banks were ready to loan and carry for the company a large sum, $500,000, when the tactics of the Messrs. Ward were so suddenly changed.

It is not necessary to impute to the Wards or their principals any other motive than that which usually governs men in moneyed transactions, viz., to make the most of their money. If having, as they do, some seven millions of dollars invested in this road, their contract gives them the right to sell it and buy it in, a court of equity must enforce that right by the foreclosure of the mortgage. And though the consequence of this may be to extinguish some thirty or forty millions of stock held by people who have done no wrong, and place in the hands of Baring Bros. & Co. a road whose future gives every promise of making that stock valuable, we must give them the benefit of the rules of chancery, in enforcing the contract which

the parties have voluntarily made. But this refers to the right to foreclose, which depends upon the existence of the default in payment, which is denied. The right to foreclose we do not and cannot decide here.

Unquestionably there may be a right to foreclose without the right to appoint a receiver, or change the possession of the property. This latter depends upon the danger of ultimate loss to the bondholders by permitting the property to remain in the possession of its owners until the final decree and sale, if one is to be made.

Without attempting here to analyze all the testimony, which we have carefully considered, much of which is in direct conflict, we are of opinion that, on what we have above stated to be established facts, there exists no such danger of loss to the parties which plaintiff represents, as to justify us in turning over to them or to a receiver all this immense property. Nor is there anything in the manner in which the owners of it have managed this property, or in their relations (otherwise than that they are debtors, to those parties, which would influence us to go beyond the strict demands of the law. They have placed the financial management of the company for several years almost completely at the control of Baring Bros. & Co. They have solicited and followed their advice in every emergency; and in the latest struggle, which is claimed to have resulted in the default on which this suit rests, they accepted and followed the suggestions of those gentlemen, though opposed to their own views of what was wisest and best.

If authorities are necessary to support a decision, which must largely rest in the discretion of the court, and which in every case must be founded on its own special circumstances, the case of Williamson v. New Albany Railroad Co. [Case No. 17,753], decided by the late Justice McLean, will be found to be almost perfect in its analogy to this, and quite so in the principles on which we decide it. The motion for a receiver is denied.

Motion denied.

[For final hearing, see Case No. 14,403.]