TYSEN (BUTCHER v.).  See Case No. 2,233.

## Case No. 14,315.

TYSEN v. WABASH RY. CO. et al.

[8 Biss. 247.] [1]

Circuit Court, S. D. Illinois, and D. Indiana. July, 1878.

RAILROAD COMPANIES — RECEIVER — FORECLOSURE OF MORTGAGE—DISCRETIONARY POWERS.

1. The appointment of a receiver pending proceedings for foreclosure, is a matter resting in the sound discretion of the court.

[Cited in Pennsylvania Co., etc., v. Jacksonville, T. & K. W. Ry. Co., 5 C. C. A. 53, 55 Fed. 136.]

[1] [Reprinted by permission.]          [1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

2. The mere fact that there has been a default in the payment of the debt, is no ground for the appointment of a receiver, unless there be a stipulation in the mortgage that the mortgagee shall have the rents.

3. The court will not, in deference to the mere technical rights of a very small minority of bondholders of a railroad corporation, appoint a receiver where it appears that such action would imperil, if not destroy, the interests of others whose rights are entitled to equal consideration.

4. In the exercise of the broad discretion which the court has, in the matter of appointing a receiver, it will not make such appointment if it perceives that a much greater injury would result to those interested in the railroad, than by leaving the property in the hands then holding it, especially, when it appears that the large majority of the stockholders and bondholders favor a funding plan then being negotiated.

[Cited in McGeorge v. Big Stone Gap Imp. Co., 57 Fed. 270.]

This was a suit to foreclose mortgages on the defendant railroad. Motion by complainant [David J. Tysen, Jr.] to appoint a receiver pending litigation.

Charles W. Hassler, James Matthews, Robert E. Williams, and S. A. Huff, for complainant.

W. Swayne, Henry S. Greene, and John N. Jewett, for defendants.

HARLAN, Circuit Justice (orally). The lines of railway now controlled by the Wabash Railway Company were formerly owned by different corporations, which respectively executed mortgages for large amounts at different times. It may be well to recall the history of those mortgages, and some of the material facts connected with the organization at a subsequent date, of the present company. The different corporations referred to, executed first mortgages to secure the following amounts of bonds: In 1853, the Toledo and Illinois Railway Company, owning 75½ miles of railway in Ohio, executed a first mortgage for $900,000. In the same year the Lake Erie, Wabash and St. Louis Railroad Company, owning 116½ miles of railway in Indiana, executed a first mortgage for $2,500 000. In 1862, the Illinois and Southern Iowa Railroad Company, owning 29½ miles of railway in Illinois, executed a first mortgage for $300,000. In 1863, the Great Western Railway Company of 1859, owning 180²/₁₀ miles of railway in Illinois, executed a first mortgage of $2,500,000. In 1865, the Quincy and Toledo Railroad Company, owning 33⁶/₁₀ miles of railway in Illinois, executed a first mortgage for $500,000. In 1869, the Decatur and St. Louis Railroad Company, owning 108½ miles of railway in Illinois, executed a first mortgage of $2,700,-000. making an aggregate of first mortgages on these different roads of $9,400,000.

Second mortgages were executed as follows: In 1858, the Toledo and Wabash Railroad Company, owning 75½ miles of railway in Ohio. gave a second mortgage of $1,000,000. In the same year the Wabash and Western Railroad Company, owning 166¹/₁₀ miles of railway in Indiana, gave a second mortgage of $1,500,000. In 1865, the Great Western Railroad Company of 1859, owning 180²/₁₀ miles of railroad in Illinois, gave a second mortgage of $2,500,000, making an aggregate of second mortgages of $5,000,000.

In 1867, the Toledo, Wabash and Western Railroad Company, a corporation formed by consolidation, and then owning all the lines of railway now operated by the Wabash Railway Company, except the St. Louis division, executed what is styled in the record the "Consolidated Mortgage." In 1873, the consolidated Toledo, Wabash and Western Railroad Company, then owning and operating the entire line of railway now owned and operated by the Wabash Railway Company, executed what is known as the "Gold-Bond Mortgage."

In February, 1875, the Metropolitan Bank of New York, and others, holding bonds secured by the gold-bond mortgage, filed a bill of complaint in the court of common pleas in Lucas county, Ohio, seeking a foreclosure and sale upon the ground of default in paying interest.

A receiver was appointed, and by him the line of railway was operated for nearly two years. Similar proceedings were had in the courts of other states as to the portions of the road in those states. In June, 1876, the property covered by the gold-bond mortgage —which was the last one—was sold under a decree at public auction, when John W. Ellis and others became the purchasers at $2,-500,000. That sale and purchase were subject, by agreement, to all mortgages prior in time to the gold-bond mortgage, the priority and continuance of all prior mortgage liens being expressly reserved in the decree and declared unaffected by the sale. So that, that sale was exclusively for the interest covered by the gold-bond mortgage. The purchase by Ellis and others was made in pursuance of an understanding previously had among those interested in the property, but whose rights were subordinate to those created by the first mortgages. Had the foreclosure taken place under the prior mortgages. or any of them, or if a forced sale had then been ordered for cash, it is entirely clear, in view of the condition of the country at that time, and in view especially of the depressed value of railroad property, that the rights of all the parties would have been seriously endangered, if not ruinously sacrificed. Hence the arrangement to sell under the gold mortgage alone. One of the avowed purposes of that arrangement was, if possible, to save something for the stockholders, who, as a general rule, in railroad foreclosures lose all. To that end the purchasing committee organized a new company with a capital of $16,000,000—that is, the present Wabash Railway Company. The stockholders of the old company were invited to put up $1,600,000 with which to buy the entire capital stock of the new company, receiving

new stock at the rate of ten for one on the subscription. Of the 160,000 shares of new stock, all were subscribed for by the old stockholders, except 800 shares, and that amount was subsequently taken by the bondholders' committee in accordance with the plan proposed.

After the purchase, the new company, on the 13th of January, 1877, executed what is called the "Seney Mortgage" upon the road for $1,026,555.22 to secure certain indebtedness which the new company agreed to pay at the time, and as a condition of its purchase, and also, perhaps, to raise funds needed by the new organization for the operation of the road.

In January, 1877, and after the execution of the Seney mortgage, a funding scheme was proposed to the bondholders for the purpose, as the company declared, of restoring the property, and placing it on a substantial and interest-paying basis. The main feature of this scheme was to give the holders of past due and unpaid coupons of prior mortgages and coupons maturing as far ahead as November 1, 1878, scrip certificates, to run until the maturity of the bonds from which the coupons were detached, bearing seven per cent. interest payable annually, the coupons to be returned to the holders whenever there was any default in paying the interest on the certificates; such arrangement in nowise to impair the liens on the portions of the road by which the respective bonds and coupons were secured. The holders of scrip certificates were given the option of funding the same into bonds of $500 or $1,000 each, with coupons at seven per cent. semi-annually, maturing in 1907, when the consolidated bonds mature, and to be called the funded debt bonds. In order to provide for the extinguishment of the funded bonds and the scrip certificates, the company, as a part of the funding scheme, proposed to set apart from its earnings after the year 1882, annually the sum of $100,000, to be invested in the purchase and the cancellation of the scrip certificates or of the funded bonds, at not exceeding the par value thereof; those pertaining to the first mortgages to be retired first, the second mortgages second, and the consolidated mortgage last.

The company, in its funding proposition, said: "The directors of the Wabash Railway Company, having in mind the fact that all the bonds cover only portions of the road, none being secured by the entire property, have endeavored to give due consideration to each class, and to treat each with the utmost liberality that the prospective earnings of the road will admit of, and at the same time keep it in a condition to enable it to earn sufficient revenue to accomplish the result proposed."

Modifications of the funding scheme were subsequently proposed, but these modifications need not be noticed here, since they do not materially affect the determination of the present motion. On the 30th of April, 1878,

the funding scheme had been expressly agreed to, by over 96 per cent. of the bondholders holding under first mortgages, by more than 84 per cent. of those holding under second mortgages, and by 70 per cent. of those holding under the consolidated mortgages. These figures are as nearly accurate as I have been able to make them. It is thus seen that over 80 per cent. of all the bondholders have agreed to this scheme. Those who have indicated their dissent in express terms are less than one per cent. of all the bondholders. The holders of nearly $100,000 of bonds, who declined to assent to the funding scheme, have, notwithstanding, filed affidavits opposing the present suit and motion. The remaining bondholders are silent so far as the record shows. Without notice to, or demand upon the trustees, this suit was instituted by Tysen, he holding some of the second mortgage and consolidated or third mortgage bonds, by comparatively recent purchases made in the New York market, for the purpose of having the mortgage foreclosed, and the road sold to pay past due interest and the mortgage debt. He sues on behalf of himself and all others in community of interest with him, and who may unite in this proceeding. Some of the bondholders have united with him, the aggregate of bonds represented on that side of the case being a little over $100,000.

The matter now before the court for its determination is the application of complainant, and those standing with him, for the appointment of a receiver, pending the proceedings for foreclosure. That motion is opposed, although the right of complainant, and those united with him in these proceedings to a decree of foreclosure, whenever the case is ripe for such a decree, is conceded.

At the threshold of this contest, the inquiry arises as to the nature and extent of the discretion which the court may exercise in determining applications for a receiver of a railroad. Judge Story, in his Equity Jurisprudence (second volume, § 831), says: "The appointment of a receiver is a matter resting in the sound discretion of the court." In High on Receivers (section 365) the author says: "While the jurisdiction of equity over railway corporations, as enlarged by the statutes and practice of the various states, is based upon and exercised in accordance with substantially the same principles which govern its jurisdiction over other corporations, the courts are more reluctant to lend their extraordinary aid by the appointment of receivers over railways than in almost any other class of corporate bodies. The importance of these corporations as being quasi-public bodies, and the peculiar nature of their property and franchises, sufficiently explain the reluctance with which equity interferes with their management, and, in general, the courts proceed with extreme caution in placing them

in the hands of receivers. And wherever the ordinary remedies provided by law are open to the creditors of such corporations for the enforcement of their demands, the appointment and continuance of a receiver in office for a long period of years, is the exercise of a judicial power which can only be justified by the pressure of an absolute necessity."

In Jones on Mortgages (volume 2, § 1516) the author says: "The mere fact that there has been a default in the payment of the debt is no ground for the appointment of a receiver, unless there be a stipulation in the mortgage that the mortgagee shall have the rents."

There is no such stipulation in these mortgages.

The supreme court of the United States, in the case of Railroad Company v. Soutter, 2 Wall. [69 U. S.] 523, says: "Sebre Howard objects to the discharge of a receiver, because he has a judgment of $16,000 against the LaCrosse and Milwaukee Railroad Company, which he claims to be a lien on the road; and as the present receiver has also been appointed receiver in his suit, he claims that his debt must first be paid before he can be discharged. The idea of appointing or continuing a receiver for the purpose of taking ninety-five miles of railroad from its lawful owners, which is earning a gross revenue of $800,000 per annum, to enforce the payment of a judgment of $16,000, the lien of which is seriously controverted, is so repugnant to all our ideas of judicial proceedings that we cannot argue the question. If Mr. Howard has a valid judgment, the usual modes of enforcing that judgment are open to him, both at law and in chancery, but the extraordinary proceeding of taking millions of dollars' worth of property—of such peculiar character as railroad property is—from its rightful possessors, as one of the usual means of collecting such a comparatively small debt, can find no countenance in this court."

Further on in the same opinion (page 524) the court says: "In reference to all these parties, we remark again that the court deprives them of none of their rights to proceed in the courts in the ordinary mode to collect their debts, and that the appointment of receivers by a court to manage the affairs of a long line of railroad, continued through five or six years, is one of those judicial powers the exercise of which can only be justified by the pressure of an absolute necessity."

Upon examination of these and other authorities cited, it will be found that the action of the courts has depended largely upon the peculiar circumstances of each case. In no instance has the action of the court, in appointing or refusing to appoint a receiver, rested exclusively upon the technical, legal rights of the parties.

The rule deducible from the cases, and which commends itself to my judgment as sound, especially in suits to foreclose railroad mortgages, is well stated in the case of Vose v. Reed [Case No. 17,011], where this language is used by Mr. Justice Bradley: "The next question is, whether the court will appoint a receiver. This is a matter always in the discretion of the court, but as a general rule a receiver will be appointed for the purpose of protecting the fund when the complainant has an equitable interest in the subject, and the defendant having possession of the property is wasting it, or removing it out of the jurisdiction of the court. But all the circumstances of the case are to be taken into consideration, and if the case be such that a greater injury would ensue from the appointment of a receiver than from leaving the property in the hands now holding it, or if any other considerations of propriety or convenience render the appointment of a receiver improper or inexpedient, none will be appointed."

Applying these principles to the case in hand, what do we find? On the side of the complainant, it appears that he is the owner of certain bonds, for the security of which mortgages were executed. In the payment of interest upon those bonds there has been a default. The present managers in execution of the funding scheme have been paying interest to those bondholders who have given their assent to that scheme, and decline to pay interest to complainant and those standing with him, who refuse to become parties to the funding scheme. More than that, the present managers are not applying all of the net revenue arising from the operation of the road to the payment of interest in the order of priority of mortgages, but are applying a portion to the discharge of obligations created by the Seney mortgage, which is the last mortgage upon the property. Complainant claims that this is a misapplication of the income, and of itself, in connection with the present supposed inadequacy of the security for all the bonds, would make it the duty of the court to take charge of the property by a receiver. Tysen and his colleagues insist that the duty of the managers is to keep down the interest on the first mortgage to the extent of the entire net income of the company; since that course, they contend, will increase the value of the subsequent incumbrances; that the company have no right, as a condition precedent to the performance of their duty, according to the legal rights of the parties, to require the complainant and his colleagues to submit to a funding scheme which they do not approve.

Upon the other hand, we find the vast majority of the bondholders, under all the mortgages, insisting that the funding scheme is the best arrangement for all concerned,

and that under that arrangement, faithfully and honestly carried out, the rights of all parties will be best secured. The company invites complainant and those now standing with him to join in that scheme with the large majority of those who have the same character of rights with them. That that scheme is being honestly adhered to, and will be carried out in good faith, the evidence does not permit me to doubt. I will not stop to state in detail all the reasons arising out of the evidence for the conclusion I have reached. But, I cannot doubt that the appointment of a receiver, at this time, would not only break up this line of railway into its original fragments, but would overturn the funding scheme, thereby destroying a large present income for the great majority of bondholders. It would, in addition, work the financial ruin of all the interests involved in this railroad enterprise, subordinate to the first mortgage boldholders, including the interests of the complainant, and those united with him in this suit. Those who will certainly suffer, and who will suffer first, will be the stockholders of the old company, and who became the stockholders in this new organization by advancing $1,600,000. None of the bondholders, including the interests of the 600,000 was advanced by the stockholders, are here actively seeking the appointment of a receiver.

Some of those who are conspicuously moving in that direction became, according to their evidence, the owners of bonds quite recently, and as we may infer from the evidence, for merely speculative purposes. The present company did not get possession of the property until January 1, 1877. It has not yet had a fair chance to test the question, whether this vast railroad enterprise in its charge, may not be saved for the benefit of all concerned in its success. It did not fairly get to work for some months after January 1, 1877, and during that time they had much to contend with. Such is the testimony of its officers. Nevertheless, we find that while the net revenue from the business of 1875 is computed at $660,385.21, and from the business of 1876, at $984,646.73, such revenue from the business of 1877 is computed at $1,384,094.37. During the first four months of 1878, the increase in the net revenue as compared with the net revenue of the corresponding four months of 1877, is computed at $156,897.99. The same increase, if it continue throughout the year, will give a net revenue in 1878 of $2,021,-686.33. These are the computations of the treasurer of the company, a witness accredited to the court by both parties, and they seem to be fairly made. That officer says:

"That, in pursuance of said agreement of 1876, large amounts of money were paid for the stock of the new company, a large sum expended in organizing and establishing a thorough management, and improvement of the property and increase of equipment; that every possible effort has been made to increase the earnings and decrease the expenses, and to increase its capacity; that the present company did not get possession of the property till January 1, 1877, and did not get fairly to work for three or four months after, and then had much to contend with in heavy storms of snow, and the strikes, which diminished earnings in the months when they are never large, say the first three or four months of the year. They are known among railroad men as unprofitable months usually. But after four or five months had elapsed the earnings began to increase and expenses to diminish, and from thence hitherto have so continued. That the net earnings, over and above operating and renewal expenses, are so steadily increasing that there is the best prospect that said road will, during the current year, be able to pay all its current interest, and also that the company will be able to pay all the suspended indebtedness under the funding scheme. That said funding scheme has already saved millions of dollars of capital, bona fide invested in the road, from utter cancellation; and that all classes of the securities of said road have been enhanced in value thereby."

Under such circumstances, and with a probability, recognized by sagacious men, that the country will soon pass from the era of hard times into an era of general prosperity for all, including those holding railroad securities, the court cannot, in deference to the mere technical rights of a very small minority of bondholders, lay its hand upon a railroad, over six hundred miles in length, running through three great states, and thereby imperil, if not destroy, the interests of others whose rights are entitled to equal consideration with those of the complainant and his colleagues. If the present management of the road were guilty of any fraud or dishonest practices in their control of this property, I should feel differently. While there are differences between them and some of the bondholders, as to certain matters connected with the discharge of the company's obligations, those differences do not involve the integrity of those operating the railroad. The court is disposed to recognize the absolute necessity of large discretion in the management of such vast property, and in the distribution of the net income arising therefrom, and it is unwilling, for the present at least, to make honest differences as to such matters, the basis for its interference by the appointment of a receiver. It will leave the parties to the ordinary remedies for the enforcement of their rights. Let the complainant proceed with the foreclosure suit, and take a decree for sale whenever it is proper to do so under the law and practice of this court. In the exercise of the broad discretion which the court has in the mat-

ter of appointing a receiver, it will not make such appointment in this case, under the present showing, for the reason that a much greater injury would result from so doing, to all interested in this railroad, including even the complainant and his colleagues, than by leaving the property in the hands now holding it pending the foreclosure suit.

The motion for the appointment of a receiver is denied, and counsel will prepare the necessary orders.