## McGEORGE et al. v. BIG STONE GAP IMP. CO.

### (Circuit Court, W. D. Virginia.    August 19, 1893.)

1. CORPORATIONS—INSOLVENCY — RIGHTS OF BONDHOLDERS—CONDITION NOT TO SUE.
   A condition in a trust deed given to secure the bonds of a corporation, providing that the bondholders shall not bring suit without notice in writing to the trustee, nor without a request to the trustee to sue, made by the holders of one-fifth of the outstanding bonds, is binding upon the bondholders in the absence of proof showing fraud or mismanagement on the part of the corporation.

2. SAME—IMPROVEMENT COMPANY—POWER TO AID OTHER CORPORATIONS.
   The Big Stone Gap Improvement Company, which was organized by Act Va. Feb. 14, 1888, to buy and sell lands, erect, sell, and lease buildings, to grade and improve streets, to furnish gas, electric light, and waterworks, to construct and operate street railways, furnaces, and mills, and to acquire by purchase or subscription the stock or bonds of any mining, manufacturing, water, gas, street-railway, or other improvement company, has power to give part of its stock to a railway company in order to enable the latter to complete its line to the property of the Big Stone Gap Improvement Company.

3. ESTOPPEL—STOCKHOLDERS OF CORPORATION—ASSENT TO ACTS COMPLAINED OF.
   Stockholders, after voting for and approving of an appropriation of corporate funds to a purpose fairly within the scope of the corporate powers, will not, in the absence of fraud, be heard to complain thereof in a court of equity.

4. CORPORATIONS—RIGHTS OF STOCKHOLDERS—SUIT IN EQUITY.
   Stockholders cannot proceed in chancery to protect their equitable rights, unless the corporation has been dissolved, or has itself been prevented from proceeding by the misconduct of its officers.

5. SAME—RECEIVERS—APPOINTMENT—INSOLVENCY NOT CONCLUSIVE.
   The appointment of a receiver for a corporation is a remedy within the discretion of a court of equity, and does not necessarily follow upon proof of the corporation's insolvency. The appointment should not be made unless it is also shown that loss will ensue to the parties in interest if the company continues in the management of its own affairs.

In Equity.    Bill by William McGeorge and others against the Big Stone Gap Improvement Company, praying an injunction and the appointment of receivers.    A temporary injunction was granted, and provisional receivers appointed.    The cause is now heard on bill and answer.    Bill dismissed.

F. S. Blair, for complainants.
Bullitt & McDowell and St. John Boyle, for defendant.

GOFF, Circuit Judge.    This suit was brought by William McGeorge, Jr., in his own right and as trustee, John C. Bullitt, Samuel

Dickson, Joseph I. Doran, Joseph B. Altimus, George Burnham, Charles C. Harrison, William Pepper, John H. Dingee, Samuel W. Colter, Jr., and Henry Lewis, citizens of the state of Pennsylvania, suing for themselves and all other creditors and stockholders of the Big Stone Gap Improvement Company, who will become parties and contribute to the expense hereof, against the Big Stone Gap Improvement Company, a corporation created by the laws of the state of Virginia, a citizen of said state, having its principal office and place of business at Big Stone Gap, in Wise county, Va. On the 20th day of May, 1893, upon reading the bill, affidavits, and exhibits filed therewith, I granted an order appointing H. C. Wood and J. K. Taggart provisional receivers of all the property of the defendant, and I directed that notice of such action be served upon the company, and ordered that it appear on the 13th day of June, 1893, and show cause, if any it could, why such appointments should not be made permanent. An injunction also issued as prayed for. On the day ordered, defendant appeared by counsel, and tendered its demurrer and answer to the bill, together with affidavits and exhibits.

Prior to the filing of the same, John C. Bullitt, Samuel Dickson, and Joseph I. Dale, who are named as complainants in the bill, through counsel, stated to the court that their names had been used as such without their authority, and filed a motion to strike the same from the bill and record of this cause. On considering the same, it appearing that there had been a misunderstanding among several of the complainants about the use of said names, and a misconstruction of the authority given relative thereto, it was ordered that the names mentioned be stricken from the bill, and that as to said parties the suit stand dismissed; and for like reasons it was at the same time ordered that the names of Bullitt, Dickson, and Dale, as counsel for complainants, be withdrawn from the bill and record of this cause.

It is stated in the bill that the Big Stone Gap Improvement Company was organized under the laws of the state of Virginia, its object being to lay off and sell town lots. That about $1,000,000 in first mortgage bonds and $1,500,000 in capital stock were issued to the original holders of the lands that had been conveyed to the company, the complainants being part of them; and also that $1,000,000 in stock was retained by the company as treasury stock. That the present management of the company has exercised almost absolute authority over the affairs of the company since its organization. That the funds and assets of said company have been wasted, misappropriated, and diverted to purposes wholly foreign to that for which the company was organized, to the great loss and injury of complainants. That the company has defaulted for five years in the payment of interest on its bonds, and is also in default in the payment of state, county, and municipal taxes. That by the mortgage given on the property of the company to secure the issue of bonds it was provided that whenever $50,000 should accumulate from the sale of lots or otherwise, 5 per centum should

be paid upon the principal of each and every bond; and the charge is made that this has not been done. That the management of said company, being largely interested in the South Atlantic & Ohio Railroad Company, donated $500,000 of the treasury stock of defendant company to said railroad company for the purpose of securing the completion of that road to Big Stone Gap. That the same was a misappropriation of the funds of the defendant. That part of said stock had been issued and delivered to the railroad company, and that the residue would be at once, if the present management of the defendant was continued, or any notice of this suit be given its officers. That the company is insolvent, and that its officers still pay themselves large salaries for the discharge of their respective duties, and that their continuance in the management of the same will increase its liabilities. That unless an injunction issues restraining them, and an order is passed appointing receivers, great and irreparable injury will result to complainants, who themselves, and through others represented by them, own over one-half of all the bonds and stocks issued by the defendant company. That many persons claiming to be creditors of the company have brought suits against it; and that it is for the interest of all creditors, stockholders, and persons concerned in the property that the court should take all the assets of defendant into custody, and administer them as a trust fund for the benefit of those entitled to share therein. The bill was sworn to. Numerous exhibits were filed, duly authenticated, and several affidavits as to the truth of the charges made were presented. On these allegations of mismanagement, waste, and misappropriation of assets, with the charge of irreparable damage, and the fear of an additional delivery of stock improperly donated, the injunction issued, and receivers were appointed.

The answer denies that the funds and assets of the company have been wasted, misappropriated, or diverted to purposes other than those for which it was organized. It claims that the donations made and the assistance rendered by the defendant to other enterprises were for the purpose of increasing the value of its property, and to carry out the object for which it was organized, and that they were so made with the assent of all the stockholders and bondholders, the complainants included. It admits that the company has failed to pay the interest due on its bonds since July 1, 1890, and that it has not paid certain taxes, but it denies all charges of fraud and mismanagement, and claims that the defendant's inability to pay is the result of its misfortune, caused by hard times, and the consequent depression of real estate. It claims that the assets of the defendant are valuable, and will, if time is given, more than pay all its liabilities. I do not think it necessary to here set forth all the claims, explanations, and charges in the answer contained. They will be, in effect, alluded to and disposed of, as I state the conclusion I have reached.

I find that the defendant was organized to purchase and sell lands in Wise county, Va., and, among other things, to erect build-

ings and sell or lease them; to grade and improve streets; to furnish gas, electric lights, and waterworks; to construct and operate street railroads; to lay out its lands into lots, streets, and parks, and improve and sell the lots; to erect, own, and operate furnaces, mills, and manufactories, and acquire by subscription or purchase the stock or bonds of any mining, manufacturing, water, gas, street-railway, or other improvement company within the territory owned by it; to issue and sell its bonds and secure the same by mortgages on its property; to subscribe to and hold shares in the capital stock of any railroad company or other corporation; and to do other things not necessary to be here mentioned. It was organized by an association of landowners composed of about 20 persons and corporations that had purchased lands at Big Stone Gap, expecting to profit by the advance in price occasioned by the building of railroads into the coal and iron fields adjacent thereto. The original cost to them of the lands averaged about $25 per acre, (excepting one small part thereof,) and about 2,000 acres of the same was conveyed to the defendant, for which the grantors received $1,000,000 in first mortgage bonds, and $1,500,000 in full-paid stock of the company. It thus appears that the associated landowners, who in the manner I have described became the stockholders and bondholders of the defendant, received $2,500,000 in stock and bonds for lands that had cost them, with the exception mentioned, (and that immaterial,) about $50,000. It seems that there never was as much as one cent of cash capital paid in by any of the stockholders, the land alone constituting the capital; and that, subject to the $1,000,000 mortgage. The stock and bonds were apportioned among the former landowners according to a valuation of their respective holdings, agreed to by them, each stockholder receiving for every $1,500 of stock held by him one bond of the denomination of $1,000. The bonds were payable in the gold coin of the United States on the 10th day of May, 1898, and bore 4 per cent. interest per annum, payable semiannually. By the terms of the mortgage executed to secure the bonds it was provided that 75 per cent. of the amount of all sales of lots made by the company should be paid over to the trustee named therein, for the purpose of extinguishing the bonded debt, and the remaining 25 per cent. was to be used as an improvement fund by the company. It was also provided in the mortgage that as soon as $50,000 should accumulate in the hands of said trustee from the sale of lots or otherwise, a dividend of 5 per cent. should be paid on the principal of the bonds; and I may remark here that the charge in the bill that this dividend has not been paid is not true. It is shown by the evidence that the fund applicable to this dividend has been regularly set apart for that purpose, and paid to the bondholders, or on their account; and that they have now received in such payments, respectively, sums several times greater in amount than was paid out by them for the lands.

The company, after organizing under the provisions of a special act of the legislature of Virginia approved February 14, 1888, pro-

ceeded to carry out the purposes for which it was formed by purchasing said lands, dividing the same into lots, streets, avenues, and parks; by building houses, waterworks, electric light works, street railways, and other improvements required by the citizens of Big Stone Gap. It did this either directly through its own officers and with its own funds, or indirectly by taking stock in and assisting other corporations duly organized for certain purposes. It has sold of its real estate over $600,000 worth of lots, or the aggregate of cash and purchase-money notes received from such sales exceeds that sum. The greater part of this has been used in defraying expenses, developing the property, assisting other enterprises, and paying dividends, while a considerable portion thereof is still held in the shape of notes given by the purchasers of lots for the deferred payments due thereon.

It was provided in the mortgage that—

"No suit, action, or proceeding in law or in equity for the foreclosure of this mortgage or deed of trust, or the execution of the trusts thereof, or for any other remedy, shall be brought or instituted except by, through, or in the name of the trustee for the time being, and then only after notice in writing to the trustee of default having occurred and continued as aforesaid, upon the request in writing of one-fifth in amount of the holders of bonds then outstanding, and the offer to the trustee of adequate security and indemnity against the costs, expenses, liabilities, and charges to be incurred therein or thereby; and such request and offer of indemnity are hereby declared to be conditions precedent for the execution of the powers and trusts of this mortgage or deed of trust to any action or cause of action for the foreclosure, or for any other remedy hereunder."

It must be kept in mind that the complainants are not proceeding as creditors of the defendant, except as they may be regarded as such from the fact that they are bondholders. What are their rights as bondholders, under the facts and the mortgage mentioned? Before considering that question I will say that the allegations of fraud and mismanagement made in the bill are not, in my judgment, sustained in a single instance, and that consequently the complainants must stand alone on their rights and privileges as bondholders and stockholders, unaided by the help that courts of equity give in cases where fraud and misconduct is shown on the part of the officers of the company complained of. And also we must remember that the rules applicable to the appointment of receivers in cases where bonds are secured by an ordinary trust, where no special and restrictive stipulations are found relative to foreclosure proceedings, do not apply to this case. In the deed of trust made by the defendant to secure the bonds held by complainants the requirements I have quoted are found, and they were placed there with the knowledge and approval of complainants, in order to enhance the value of the bonds secured, aid the credit of the company, and enable the holders of the bonds to dispose of them advantageously. They are part of the consideration offered by the company and accepted by the bondholders when the contract was made, and they are as valid as the other provisions of the trust, and as binding on the bondholders as those other stipulations are on the company. State v. North-

ern Cent. R. Co., 18 Md. 193. This requirement of the deed of trust has been entirely ignored by the complainants as bondholders, although, in the absence of proof showing fraud or mismanagement on the part of the company, it is binding upon them. They have not given the notice in writing to the trustee of the alleged default, nor has any request to institute suit been made by one-fifth of the holders of the outstanding bonds, and neither has the trustee been offered security against costs and charges. No ground whatever is shown why the court should ignore the manner of procedure provided by the parties themselves for their mutual protection. I therefore hold that, as bondholders, complainants, on the case as now made, have no standing in this court, and cannot have until they have first exhausted the remedies provided for them in the trust, or have shown their inability to do so because of the fault of the defendant or of its management.

The complainants claim that they and the interests they represent own over one-half of the capital stock of the Big Stone Gap Improvement Company. This is denied in the answer, defendant insisting that complainants do not own over one-tenth part of such stock. In order to sustain the allegations of the bill in this regard, complainants insist that the 7,336 shares of said stock now owned by the Virginia, Tennessee & Carolina Steel & Iron Company should be classed with them, as opposed to the present management of the defendant company. It appears that at the last two meetings of the stockholders of defendant there were controversies relative to the representation of said stock, it being claimed by complainants that J. M. Bailey, as receiver of the Virginia, Tennessee & Carolina Steel & Iron Company, was entitled to represent and vote the stock owned by said company, while other stockholders held that Haskell and Conklin were the legally appointed receivers of that company, and that J. B. Richmond, its attorney, was the proper person to represent and vote its stock. This court in this proceeding will not determine the questions involving the rights of those claiming to be receivers of said company, nor will it decide who was entitled to represent the stock held by that company in the Big Stone Gap Improvement Company. The decision of those matters would not dispose of the questions now in controversy; in fact they have no proper connection with the present issue. Complainants, by this contention, seek to show that a majority of the shares of stock of defendant is opposed to its present management, and in favor of the course pursued by them. If such be the fact, it is worthy of consideration, and should not be overlooked by the court. The controversy as to the stock owned by said iron and steel company may be solved as claimed by the complainants, and still their position in the matter now under consideration would not be sustained. I think that a majority of the stock of defendant company not only refuses to indorse the action of complainants, but actively and strenuously resists it. As the complainants have invited the consideration of this rule they will not object to its proper application to

,the facts of this case. There is an absolute failure to sustain the allegation in the bill that the complainants and the interests they represent own over one-half of the stock of the defendant company. This claim, under all the circumstances of this case, should not have been made, or, if relied upon, all the facts connected with the controversy on which it is based should have been set forth by complainants, in order that the court might be fully advised, and not misled.

As stockholders, the complainants are interested in the proper management of the company, in the payment of all its liabilities, in the sale of its real estate, and the distribution of its assets. They charge that the funds of the company have been wasted, and its assets misappropriated and diverted to purposes wholly foreign to those for which it was organized, to their loss and injury. I do not find that these charges are sustained. The appropriations, donations, and subscriptions to stock by the company to the various purposes and enterprises set forth in the bill were all made with the assent of the stockholders, including complainants, most of whom voted for them, as they were in the line of the enterprise in which the company was engaged, and to which the stockholders were committed. It was simply an effort to carry out the object had in view when the company was organized, for which the one-fourth portion of the income received from the sale of lots was set apart, as was provided in the charter, and nominated in the bond. I find that the stocks and bonds held and owned by defendant, issued by other corporations, were purchased and secured with the one-fourth part so received, and not with trust funds to which the bondholders were entitled. The directors of the defendant seem to have advised fully with its stockholders and consulted with its bondholders, more so than is usually done; and, as the evidence discloses, they were always governed by the advice received. It is true that a number of the enterprises that were assisted with the funds of the company have not as yet developed into remunerative investments by demonstrating their dividend-earning capacities. Still the evidence shows that the officers honestly endeavored in these instances to enhance the interest of the company, and that in their efforts they had the approval of the stockholders and the commendation of the present complainants.

It is clearly shown that complainants were not only aware of the proceedings had at the meetings of the stockholders and directors, when the expenditures now complained of were authorized, but that they gave them their cordial support. Will they now be permitted in a court of equity to complain of those things which they did, to charge others with wrongdoing, when those others have simply done that which they were directed by complainants to do? Stockholders of a corporation that has been managed without fraud will not be permitted, after they, for reasons of their own, have become dissatisfied with the plan of organization or the management thereof, to force the abandonment of the business, and compel the

majority of the shareholders to submit to the will of the minority, by the decree of a court of equity. If they had this power it would frequently be exercised to the detriment of the corporation, the very existence of which might be thus destroyed, or the value of its stock seriously impaired. Rival companies might make it to the interest of this minority so to act, or the stock of a corporation might be purchased with such object in view, and the result would be that the security relied upon by those investing in corporate property would be seriously impaired.

The charters under which corporations are organized, and the laws by virtue of which they are created, provide the way in which they shall be managed, as well as the mode of voting the stock and the manner of electing the officers thereof; and, if these provisions have been fairly complied with, then there is no ground for the interference of a court of equity on the complaint of a dissatisfied minority shareholder. If he disapproves of the management that has been conducted without fraud and under the requirements of the law, his only remedy is to elect new officers in favor of another policy by appealing to the stockholders, or, failing in that, to sell his stock and retire. Certainly the equity courts of the country will not undertake to manage it for him, nor will they, under such circumstances, take jurisdiction for the purpose of closing up the affairs of the corporation. Such power is never exercised in the absence of a statute giving the jurisdiction, and I find no such enactment applicable to this case. In the absence of such legislation the business matters of a corporation can only be controlled, or its charter privileges taken from it, by the proper and usual proceedings in such cases provided in the courts of law. Chancellor Kent, in a leading case on this subject, said:

"I admit that the persons who from time to time exercise the corporate powers may, in their character of trustees, be accountable to this court for a fraudulent breach of trust, and to this plain and ordinary head of equity the jurisdiction of this court over corporations ought to be confined." Attorney General v. Utica Ins. Co., 2 Johns. Ch. 371.

"It cannot be concealed," said the chancellor in Bayless v. Orne, 1 Freem. Ch. (Miss.) 173, "that to decree the prayer of complainants' bill would be to decree a dissolution of the corporation. In this respect it differs materially from bills which have frequently been entertained by courts of equity at the instance of stockholders against the directors of a corporate company to compel them to account for the improper use of funds, or to restrain them from violating their trust. That a court of equity, as such, has not jurisdiction or power over corporate bodies for the purpose of restraining their operations or winding up their concerns is, I think, well settled by various authorities." See, on this subject, Verplanck v. Insurance Co., 1 Edw. Ch. 84; Attorney General v. Bank of Niagara, 1 Hopk. Ch. 354; Neall v. Hill, 16 Cal. 145.

In Treadwell v. Salisbury Manuf'g Co., 7 Gray, 393, it is said:

"Indeed, it is too well settled to admit of question that a court of chancery has no peculiar jurisdiction over corporations to restrain them in the exercise of their powers, or control their action, or prevent them from violating their charter, in cases where there is no fraud or breach of trust alleged as the foundation of the claim for equitable relief. Their rights and duties are regulated and governed by the common law, which in most cases furnishes ample remedies for any excess or abuse of corporate powers and privileges, which may injuriously affect either public or private rights. It is only when

there is no plain and adequate remedy at law, and a case is presented which entitles a party to equitable relief, under some general head of chancery jurisdiction, that a bill in equity can be maintained against a corporation. And this rule is applicable to stockholders as well as to other persons." See Ang. & A. Corp. § 312; Grant, Corp. 71, 271; Mozley v. Alston, 1 Phil. Ch. 790; Hodges v. Screw Co., 1 R. I. 350; Baker v. Railroad Co., 34 La. Ann. 754.

The rule is also well established that a corporation claiming redress for wrongs must proceed through its regularly appointed agents. It is only when the company has been dissolved, or is prevented from proceeding by the misconduct of its officers that the stockholders may themselves proceed in chancery for the protection of their equitable rights. If the directors refuse to act, or are themselves guilty of a wrong that the majority of the stockholders refuse to correct, equity will interfere at the suit of a stockholder. Mor. Priv. Corp. § 239, 381, 386; Moore v. Schoppert, 22 W. Va. 282, 291; Hawes v. Oakland, 104 U. S. 450, 460; Foss v. Harbottle, 2 Hare, 493. In this case the complainants allege that they control a majority of the shares of stock of the defendant. If that is so, they will have no trouble in calling a stockholders' meeting of the company and therein so voting their stock as to correct the wrongs of which they now complain, and fully protect their interests in the future. Unless they are mistaken in this claim, it seems strange that they have not so acted before this, provided they believed the company was mismanaged.

The appointment of a receiver—always in the discretion of the court—will not be made if it is for the best interest of those concerned that the property in controversy should remain in the hands and under the control of the owners thereof. This discretion of the court should be a reasonable one, governed to a great extent by the facts as they are presented in each particular case, as no rule generally applicable has been or can be established. Nor will this discretion be controlled by the technical legal rights of the parties, but all the equities of the entire case will be considered. The power of appointment is extraordinary in its nature and far-reaching in its effects, and will be resorted to with the utmost caution, and only under such circumstances as demand summary relief. Williamson v. Railroad Co., 1 Biss. 206; Crawford v. Ross, 39 Ga. 44; Furlong v. Edwards, 3 Md. 112; Verplank v. Caines, 1 Johns. Ch. 57. Mr. Justice Bradley, in Vose v. Reed, 1 Woods, 650, says:

"But all the circumstances of the case are to be taken into consideration, and if the case be such that a greater injury would ensue from the appointment of a receiver than from leaving the property in the hands now holding it, or if any other considerations of propriety or convenience render the appointment of a receiver improper or inexpedient, none will be appointed."

In the case of Tysen v. Railway Co., 8 Biss. 247, Mr. Justice Harlan, applying these principles, refused to appoint a receiver, although there had been default in the payment of interest on bonds, and insolvency was in effect admitted. The circumstances in that case demonstrated, as the facts in this case do, that the appointment of a receiver would imperil the interests of others whose

rights were entitled to as much consideration from the court as those of the complainants. The appointment of a receiver does not necessarily follow upon the insolvency of the corporation being proven, and will not be made unless it is also shown that loss will ensue to the parties in interest if the company continues in the management of its affairs. Union Trust Co. v. St. Louis, etc., R. Co., 4 Dill. 114; Tysen v. Railway Co., 8 Biss. 247.

My conclusion is that sufficient cause has not been shown to justify the court in appointing permanent receivers in this case. Certainly the complainants, as bondholders and stockholders, have given the court no such facts as authorize it to retain the possession and control of defendant's property, and they sue in no other capacity, not claiming to be general creditors, and not making the trustee a party, nor charging him with fraud or failure to discharge his duties. The charge in the bill that many persons claiming to be creditors of defendant have instituted suits for the recovery of their claims is not supported by the evidence. That the company is indebted to various parties is conceded, but its creditors do not seem to be pressing for the collection of the sums due them, but, on the contrary, appear to favor the policy insisted on by the majority of the bondholders, stockholders, and directors of pursuing the present plan of management, and depending upon the return of the prosperity with which they were heretofore favored, and which they confidently, and not without reason, expect, as the best means of protecting the common interests of all concerned in the Big Stone·Gap Improvement Company.

The order granted in this cause on the 26th day of May, 1893, appointing provisional receivers, was founded on the allegations of the bill as to the misconduct of the officers of the defendant company, and the misappropriation of its funds by them, and was intended to prevent great and irreparable injury to the stockholders by the improper use and delivery of $500,000 in amount of the treasury stock of the company; the complainants representing that they and others represented by them owned over one-half of all the bonds and stock issued by the defendant. These allegations were supported by affidavits and exhibits. From the conclusion I reach it is evident that I find that the complainants were mistaken in several particulars, and that the inference drawn by some of them from the circumstances alluded to are not justified by the facts, at least as they are now presented for my consideration.

I will now pass a decree dissolving the injunction herein heretofore granted, and directing the provisional receivers to restore to the Big Stone Gap Improvement Company all of its property now in their hands; requiring them to make a report of their proceedings as such receivers to this court preliminary to the settlement of their accounts and their discharge as such officers; refusing the prayer of the bill, which, after the court has passed on the receivers' accounts, will be dismissed, at cost of complainants.