(17 Misc. Rep. 43)

### STEINWAY v. STEINWAY & SONS et al.

(Supreme Court, Special Term, New York County. May, 1896.)

**1. CORPORATIONS—ULTRA·VIRES—PROVIDING RESIDENCES FOR EMPLOYES.**

It is not ultra vires for a manufacturing corporation to purchase a large tract of land for the purpose of erecting thereon its factories and residences for its employés, and to contribute towards the establishment there of a church, a school, a free library, and a free bath for its employés.

**2. SAME—GIVING AWAY GOODS.**

It is not ultra vires for a manufacturing corporation to give away some of· its manufactured goods for the purpose of extending the reputation thereof.

**3. SAME—ACQUIESCENCE BY STOCKHOLDER.**

Acts of a corporation will not, at the suit of a stockholder, be enjoined on the ground that they are ultra vires, where they have been beneficial to the corporation, and such stockholder made no objection thereto during several preceding years, though he knew the facts.

Action by Henry W. T. Steinway against Steinway & Sons and others for an injunction. Complaint dismissed.

Wheeler H. Peckham and Edward B. Hill, for plaintiff.

George W. Cotterill and Henry Hoyt, for defendants.

BEEKMAN, J. The plaintiff is a stockholder of the defendant corporation, Steinway & Sons, and brings this action against the trustees of the corporation for injunctive relief restraining the continuance of certain acts alleged to be ultra vires, or·to involve wasteful, extravagant, and unnecessary expenditures, having no proper relation to the business of the corporation. An accounting is also asked for in respect to past transactions of this character, and the enforcement of a personal liability against the trustees to the corporation by reason of these alleged unlawful acts.

It is proper to state at the outset that the issues in this action do not involve any charge of fraud. It is not claimed that there was, nor does the evidence justify the slightest imputation of, bad faith· on the part of any of the defendants. The inquiry, then, is largely limited to the question of corporate power, and the equities which bear upon the plaintiff's right to impeach the acts of which he complains. The evidence is so voluminous, and the range of inquiry has been so broad, covering, as it has, some 16 years,—the entire period of the corporate existence of Steinway & Sons,—that I shall not undertake to do more than to state my conclusions upon the proofs, although the entire record has been examined with the care which the importance of the questions involved has required.

The chief ground upon which plaintiff rests his complaint is the very large, and, as he claims, unnecessary, holdings of real estate by the corporation, and the extensive expenditure of money in developing the property for purposes having no immediate relation to the objects for which Steinway & Sons was incorporated. It appears that the company was incorporated in 1876, under the general manufacturing act of this state, for the purpose, as expressed in the certificate of incorporation, of manufacturing and selling pianofortes and other.musical instruments. At that time the business was one of

large proportions, which had for many years been conducted by the Steinway family as a co-partnership, and the change which was effected by the incorporation was one of form rather than of substance. It continued to be the same in its object and purposes, and under substantially the same ownership and control. The incorporators were the co-partners, the defendant William Steinway, and his brothers, C. F. Theodore Steinway and Albert Steinway, by whom all of the assets of the firm were transferred to the corporation in exchange for the greater part of the capital stock, which was fixed at $1,500,000. Among these assets were certain real estate in the city of New York, and some 400 acres of land, situate at Astoria, and within the limits of Long Island City, in Queens county. The principal factory and field of mechanical operation was in this city, but it was designed ultimately to transfer the entire manufacturing plant to Astoria, and it was with this purpose that the land at that place had been originally acquired. This policy thus inherited, and which has been continued by the corporation, was founded upon the theory that the growth and expansion of the business would require larger accommodations, which could not be obtained in the city of New York, and also that provision could be made for gathering together, as residents upon the property, the large number of employés in their service, under conditions and influences of exceptional advantage to them and their families, and thus promoting better and more permanent service on their part in their relations to the business. At the time this property was taken over, this policy was in course of execution. A portion of the manufacturing was carried on there, and some houses had been constructed in which employés of the company resided. Since then, other factory buildings have been erected and improvements made, so that at the present time the manufacturing part of the business of the corporation is almost exclusively located there; and a very large proportion of the employés live upon the property in proximity to their work, either in houses owned by the corporation or which they have acquired themselves by purchase from the corporation. For their benefit, the company has also, at a very moderate expenditure, contributed specific property and money towards the establishment of a church, a school, a free library, and a free bath,—all agencies the usefulness of which, in the development of the best industrial results of a community, is fully recognized. The mass of these employés are skilled operatives, who have been permanently in the service of the company for many years, in harmonious relations with their employer, which have been practically uninterrupted by strikes or suspension of business for any cause. It may be fairly inferred from this that this policy of the company in dealing with its operatives has been a wise one, and, apart from its moral aspects, has materially contributed to the resources of the corporation. In connection with this general purpose, and also for the purpose of developing the remainder of this large tract, comprising in all about 400 acres, the trustees of the corporation have from time to time authorized the expenditure of money in regulating several streets or avenues running through the property, and in the

construction of sewers and the supply of water. There is nothing in the proofs before me which reflects upon the wisdom of this, or which tends to show that the company has not realized a profitable return from the expenditure. At the time the property was taken over by the company upon its incorporation, it had been laid out as a part of the city in which it is, with streets and avenues, and had been subdivided into lots. Its character was thus fixed, and, assuming that the corporation had the right to hold that portion of it which was not necessary for its immediate needs and future wants, the propriety of these expenditures could not be assailed.

It is contended, however, on the part of the plaintiff, that all of the disbursements to which I have referred, saving only those immediately connected with the works and plant, were improper, and not within the competency of the trustees to sanction; that the corporation was actually engaged in an extensive land business, which was outside of its chartered powers; and that the contributions made towards the church, library, and kindred enterprises, to which I have referred, were likewise without authority in law.

The general rule of law, undoubtedly, is that a corporation must keep within the prescription of its charter. The difficulty, however, which arises, and which has given birth to the many decisions upon the subject, to some extent conflicting, is in the application of the rule to individual cases, so that the question is mainly one of construction. 27 Am. & Eng. Enc. Law, 355, where it is also said:

"It may be stated as a general rule that the charter of a corporation, read in connection with the general laws applicable thereto, is the true measure of its powers, and a transaction manifestly beyond those powers is ultra vires; yet whatever, under the charter and general laws, reasonably construed, may fairly be considered as incidental to the purposes for which the corporation was created, is not to be taken as prohibited, but is as much granted as that which is expressed."

It is a question, therefore, in each case, of the logical relation of the act to the corporate purpose expressed in the charter. If that act is one which is lawful in itself, and not otherwise prohibited, is done for the purpose of serving corporate ends, and is reasonably tributary to the promotion of those ends, in a substantial, and not in a remote and fanciful, sense, it may fairly be considered within charter powers. The field of corporate action in respect to the exercise of incidental powers is thus, I think, an expanding one. As industrial conditions change, business methods must change with them, and acts become permissible which at an earlier period would not have been considered to be within corporate power. This, I think, tends to explain the difference found in the reported cases. In the absence of any more specific guide than the very general rule adverted to, it is plain that in many cases ample room will be found for such differences of opinion. I have been quite conscious of this in coming to the conclusion which I have reached, that the acts of the trustees of Steinway & Sons in providing, as they have done, for the physical, intellectual, and spiritual wants of their employés, under the circumstances of the case, were not ultra vires.

The transfer of their manufactory to the Astoria site was a reasonable exercise of a conceded discretionary power, which cannot be criticised or questioned here. As, however, it involved also the transfer of a large number of operatives, whose well-being was essential to the proper and efficient performance of their work, and thus to the success of the corporation, a close and practical business relation subsisted between the provision made by the defendants for their employés and the object for which the corporation was organized. The district was sparsely settled, and it was desirable that the men should live within easy reach of their place of employment. It was also desirable (it may, I think, be said to have been necessary) to the success of the scheme that some provision should be made for the moral as well as the material needs of this new and isolated community, thus brought, by the exigencies of their employment, into a measure of social dependence upon their employer. It was also a part of the scheme, by this segregation of their employés, and surrounding them with healthful influences, to remove, or at least minimize, the temptation to participate in unreasonable strikes and agitations. It can hardly be doubted that such a policy as this, intelligently and liberally executed, might reasonably be expected to insure the continued and faithful services of a skilled and contented body of operatives. And so it seems to have turned out in this case. A large number of their men have for years been in the uninterrupted employment of the corporation. Nor has the arrangement been without incidental profit to the company, which has realized a pecuniary return, either in rentals or upon sales of dwellings, many of which have been purchased by the workmen.

In view of the situation which has been outlined, I am not prepared to hold that the very moderate expenditures or contributions of the company towards church, school, library, and baths were outside of its incidental powers. The scheme must be taken as a whole, and, from that point of view, every part of it was directly related to the legitimate objects of the corporation. Excluding from this large tract all that is now used or which may be needed in the future for corporate purposes, there still remains an extensive area, which, the plaintiff contends, should be disposed of. He has also criticised certain expenditures made upon this property, which have already been referred to, for regulating certain streets, sewering, and similar improvements. One answer to this seems to be that this land has always been held for sale, a large portion of it has been sold, and sales still continue to be made. Whether it was quite within the right of the trustees to acquire for the corporation land which was unnecessary for its purposes it is unnecessary to determine. The corporation is and has been doing all that the court could require it to do in transmuting it into money. The expenditures to which I have referred were advantageous to the property, such as at some time at least would have to be made, and tended to render the property salable.

Another account which was the subject of attack on the trial was the "accommodation account," as it was called. It appears,

however, that, before this action was brought, the defendants, on the demand of the plaintiff, discontinued the transactions exhibited in this account, which were in the nature of discounts or loans of credit of the corporation; and the account now represents only business paper, which, when renewed, is, for convenience, entered under that title. To this there can be no legal objection. The evidence further shows that the "accommodation account," so called, has been a considerable source of profit to the corporation. In no case has it involved loss; and, even assuming that this line of business was quite in excess of corporate power, no damage is shown to form the basis of a recovery against the trustees by reason of it.

Objection has also been made to a number of other accounts, which comprehended expenditures of various kinds to secure the good will of musical artists, and testimonials to the value and supremacy of the Steinway piano. In some cases pianos were given to fairs for charitable purposes, and like donations or expenditures were made to musical artists; but for the most part this was done as a matter of business, and in the expectation that the reputation of the Steinway piano would have wider currency and its sale be thereby increased. Steinway & Sons were not without rivals, and the competition was such that the trustees were justified in employing all legitimate means which the nature of the business would suggest as likely to be effective in widening their field of occupation in the market. How far some of these items of expenditure included in the accounts referred to, and others which were attacked upon the trial, may have exceeded just limits, I shall not undertake to discuss, as I think the plaintiff either expressly or tacitly approved of or acquiesced in them, and has thereby made them his own, and cannot now be heard to impeach them. And this applies to all of the transactions of the trustees which are embraced within the complaint. The principle is, I think, correctly stated in 27 Am. & Eng. Enc. Law, p. 392, where it is said:

"But where the ultra vires business is pursued for the benefit of the corporation, and it has the actual benefit thereof, and is so acquiesced in by the stockholders that it actually, although illegally, becomes the business of the corporation, it may not maintain an action against the officers for damages suffered therein. In other words, a corporation engaged in ultra vires dealings may not sue, for damages suffered therein, the agents it employs to carry on the business. In such a case the corporate agent would be protected just as the agent of a co-partnership who does business, with the express or implied consent of the co-partners, which is not authorized by the articles of co-partnership."

The plaintiff was not only a stockholder in the corporation of Steinway & Sons by original subscription, but, during all the times when the transactions assailed took place, he was in the employment of the company, holding a responsible position, and was fully informed in respect to the business in all its details. He attended many of the meetings of the trustees, was himself a trustee for a short period, and was in frequent conference and consultation with the officers in reference to the affairs of the corporation. The books were open to him at all times, and were frequently examined by him; and, at one time or another during the period of 16 years

within which the transactions assailed took place, most of these acts were the subject of comment by him or in his presence. In some cases he approved; in others he expressed some dissent; but in no case did that dissent take the form of protest or objection in any such sense as to justify a belief on the part of the trustees that the position of the plaintiff was one of settled opposition to the course they were pursuing, or that the dissent, which was never formally made to the trustees, was more than a personal opinion, not insisted upon or intended to be considered as an objection which should prevail over the opinion and judgment of the other members of the corporation.

For years the plaintiff suffered his fellow stockholders and the trustees of the corporation to rest in the belief that the matters of which he now complains were acquiesced in by him. No demand was at any time made by him that transactions which he deemed objectionable should stop, except in the single case of the accommodation account, to which I have referred; and he allowed the trustees to proceed in the belief that all of the stockholders assented to and approved of their management. The plaintiff is not in the position of any ordinary stockholder. He was, as I have said, actively engaged as an employé of the company in promoting its interests. He was intimately acquainted with everything that was done upon the Astoria property. He was a trustee of the church which had been assisted by Steinway & Sons. He contributed to the free library. He supervised the improvements of which he now complains, and, in general, fell in with and co-operated in forwarding the plans of the trustees in respect to the property, its uses, and ultimate disposition. His claim now that the property not in use for manufacturing purposes should have been sold is shown to be a recent change of view by his dissent when at one time it was suggested that a portion of it, known as the "Mansion Property," should be sold. Year after year he took part in making up the annual statement of account, or "inventory," as it was called, upon the basis of which dividends were declared, and took part in the conferences then had, at which the business affairs of the corporation were discussed, and its assets valued. Year after year he attended the stockholders' meetings, and voted for the trustees whose conduct he is now attacking. To mitigate the effect of this, the counsel for plaintiff claims that the vote of the plaintiff was useless and unnecessary, on the ground that under the by-laws the trustees who were elected were the only ones, except the plaintiff, qualified to act as such. The explanation is not felicitous, as it only adds to the force of the claim that the vote was an expression of approval of the acts of the trustees, of which the plaintiff was fully informed. His confidence in the management of the company was further illustrated by his subscription in 1891 to the increase in the capital stock, and the claim he made to be afforded an opportunity of bidding for more should any of the stockholders fail to exercise their options. The stockholders are, with some few exceptions, members of the Steinway family, and closely related to one another. Of these, William Steinway, the president of the company, has al-

ways been the largest holder of stock, his present holding being something over 40 per cent. of the entire capital stock. The trustees at all times have, as stockholders, represented a large majority of the stock; and they have thus been under a personal incentive to perform their duties with zeal, and for the best interests of the stockholders. There is not a scintilla of evidence showing that they have ever abused the confidence reposed in them, or that they have used their position of vantage as majority shareholders to oppress, defraud, or impose upon the minority. Of the entire number, none except the plaintiff, who owns a little over 7 per cent. of the capital stock, has undertaken to call any of the acts of the trustees in question.

We are entitled to consider results as evidence of the success of policies and methods. What these results have been in this case is shown by the great and profitable expansion of business which has marked the history of this corporation from its inception. This is reflected in the dividends which, prior to the commencement of this action, have been from year to year declared and paid to the stockholders, at the following rates: From 1878 to 1882, at 6 per cent.; in 1883, at 12 per cent.; in 1884, at 10 per cent.; in 1885, at 12 per cent.; in each of the years 1886, 1887, and 1888, at 15 per cent.; in 1889, at 18 per cent.; in 1890, at 20 per cent.; in 1891, at 20 per cent.; in 1892, at 18 per cent. The evidence also tends to show an enormous increase in the value of the lands at Astoria, which have become a most valuable asset of the corporation, and are now the site of a flourishing community, which since 1876 has increased in population from 300 to about 3,000 persons. In view of these facts, the failure of any other stockholder to join with the plaintiff in his action is quite explicable; and if it had not been for a rupture of the friendly relations between him and the trustees, growing out of circumstances not connected with the matters in suit, which was followed by his resignation as an employé, it may well be doubted whether this action would ever have been brought. The transactions which he now seeks to impeach cover a period of some 16 years, during all of which time he has been in a position to inform himself, and did inform himself, of every detail of the business. There was no concealment or suppression of a single fact by the trustees. He was treated fairly and with the greatest frankness. His opinion was sought. He was invited to attend the meetings of the board, and, from time to time, was requested to become a trustee. The books were open to him, and were repeatedly consulted by him. If he had aught to complain of, he should have properly presented his objections; and, if they were disregarded, he should then have promptly sought relief through the courts. This he did not do, and it would now be unconscionable to permit him to insist upon the responsibility of the defendant trustees for acts done by them in good faith, and which the conduct of the plaintiff justified them in believing were acquiesced in by him. I find that he has so acquiesced, and he cannot now be allowed in a court of equity to call the trustees to account in respect to that to which he has practically assented.

The administration of the affairs of the corporation under a policy of management or direction of which the acts complained of form a part has been wise, upright, and conspicuously successful. No fraud or imposition has been practiced by any of the defendants, and in the few isolated instances, involving small amounts, in which specific acts may be debatable, they acted in good faith, and in the belief, justified, so far as the plaintiff is concerned, by his conduct, that they had the approval of all the stockholders. Under these circumstances, the plaintiff was bound to make out a very clear case for equitable relief to call for the interference of the court. This, I think, he has utterly failed to do, for the reasons which I have stated. Nor do I find any evidence of a purpose on the part of the defendant trustees to conduct the business, or any part of it, in excess of corporate power, or otherwise in violation of their duty, to justify an injunction. The court proceeds with caution in the application of such a remedy, and grants it only upon a clear case, where such intervention is essential to the protection of rights which are in jeopardy. Leslie v. Lorillard, 110 N. Y. 519, 18 N. E. 363. For reasons which I have given, it follows that the defendants are entitled to judgment dismissing the complaint on the merits, with costs.

Complaint dismissed, with costs.