DERR *et al.* v. FISHER *et al.*

No. 2065, Okla. T.   Opinion Filed September 12, 1908.

(98 Pac. 978.)

1.   **CORPORATIONS—Powers—Express and Implied.**   Corporations possess the powers expressly conferred upon them by law, and such implied powers as are necessary to enable them to exercise the powers expressly granted; and, if a contract made by a corporation is germane to the purposes for which it is formed, is not in violation of its charter, the public policy of the state or any statute prohibiting it, and the corporation by its promise induces a party relying thereon to expend money and perform his part of the contract, the corporation is liable thereon.

2.   **SAME—Contracts—Ultra Vires.**   The Shawnee Light & Power Company, a corporation created "to own, acquire, construct, maintain, equip and operate buildings, machinery and plants for the purpose of generating and supplying electricity and gas for illuminating, heating, and manufacturing purposes," and whose charter authorizes it "to make and perform contracts of any

kind and description," may enter into a valid contract with a paving company to provide for paving along the line of track of a street railway corporation with which such first corporation has a contract, running for a period of 20 years to furnish power; such contract being within the authority granted in its charter, and not prohibited by public policy or any statute.

3.  SAME—Officers—Ratification of Acts.  Such contract when executed by the president of the light and power company, who owned a majority of the stock in both corporations, and afterward ratified by the board of directors of the light and power company, and acted on to its detriment by the other contracting party, becomes a binding obligation of the company.

(Syllabus by the court.)

*Error from District Court, Pottawatomie County; B. F. Burwell, Judge.*

Action by J. C. Fisher, as receiver of the Shawnee Light & Power Company, and others, against Charles T. Derr and others, partners doing business as the Oklahoma Paving & Construction Company. Judgment for plaintiffs, and defendants brought error to the Supreme Court of the territory of Oklahoma, whence the cause was transferred to the Supreme Court of the state of Oklahoma. Reversed and remanded, with instructions.

On February 25, 1905, the plaintiff J. C. Fisher, as receiver of the Shawnee Light & Power Company, a corporation, commenced his action against C. J. Becker, as city clerk of the city of Shawnee, and C. C. Pottenger, as city treasurer of said city, and the Oklahoma Paving & Construction Company, a partnership, composed of Charles T. Derr, John A. Derr, and Frank A. Derr, the petition alleging that on the 10th day of November, 1904, the plaintiff was duly appointed receiver of the property of the Shawnee Light & Power Company in an action pending, wherein J. H. Draughn was plaintiff and the Shawnee Light & Power Company defendant, and that he qualified and entered upon the duties of such receivership : that C. J. Becker and C. C. Pottenger are the duly elected and qualified clerk and treasurer of the city of Shawnee, Okla., and that the Oklahoma Paving & Construction Company is a partnership composed of Charles T. Derr. John A. Derr, and Frank A

Derr, engaged in the business of paving the streets of cities in Oklahoma Territory; that the city of Shawnee had contracted with the Shawnee Light & Power Company, agreeing to take certain street lights and to pay therefor the sum of about $500 per month; and that the said city had issued warrants for each of the months during the life of said contract up to the 1st day of June, 1904, in payment of the obligations incurred thereunder. The petition then continues as follows:

"That six of the said warrants, aggregating the sum of $2,500 to wit, warrants issued June 1, 1904, July 1, 1904, August 1, 1904, September 1, 1904, October 1, 1904, November 2, 1904, were issued by the said city upon the said dates and delivered by the said city clerk, C. J. Becker, to the Oklahoma Paving & Constuction Company, one of the defendants herein, and that the said warrants were delivered to the said Oklahoma Paving & Construction Company under a pretended contract executed by the Shawnee Light & Power Company and the said Oklahoma Paving & Construction Company, by the terms and conditions of which the said Shawnee Light & Power Company contracted and agreed to pay certain indebtedness owing by the Shawnee Traction Company, another and separate corporation, to the Oklahoma Paving & Construction Company for paving certain portions of Main street, between the rails and for two feet on either side of the rails of the said Shawnee Traction Company's tracks."

Thereafter, and on the 19th day of March, 1906, the plaintiff, after having first received permission of the court, filed an amendment to his said petition, as follows:

"That, in addition to the allegations of his original petition, he states that the said J. J. Henry, who executed the pretended contract for the Shawnee Light & Power Company, which said contract is exhibited to the original petition, was at the time he attempted to execute the same the president and treasurer of the Shawnee Light & Power Company, and was also president and treasurer of the Shawnee Traction Company, and that the said Derr well knew when the same was pretended to have been executed that the said Henry was president and treasurer of both of the said companies, and that he had no authority to execute contracts for the Shawnee Traction Company except by direction of its board of directors, and had no power or authority to execute

the contract in question or any contract which was for the benefit of the traction company without the board of directors of the said Shawnee Light & Power Company authorizing the same, and the said Derr, defendant, and all of the other defendants, knowing full well that the said Henry was president of both of the said corporations, well knew that he was not authorized to execute the said contract for Shawnee Light & Power Company. Wherefore, in addition to the prayer in the original petition, the plaintiff prays that the said Derr be required to turn over the warrants in his possession or under his control and issued to him the said plaintiff, and that plaintiff be adjudged entitled to the said warrants whether delivered to Derr or which are still held by the treasurer of the said city."

The material part of the contract to which reference is made in the petition is as follows:

"This memorandum of agreement made and entered into by and between the Shawnee Light & Power Company, a corporation, party of the first part, and Chas. T. Derr, Jno. A. Derr, and Frank A. Derr, copartners, as the Oklahoma Paving & Construction Company, parties of the second part, witnesseth that, whereas, the Shawnee Light & Power Company has a contract with the city of Shawnee to furnish said city with electric light and has an income from said city from said source, in excess of five hundred ($500.00) dollars per month; and whereas, the said parties of the second part, having entered into a contract with the Shawnee Traction Co., to put down paving and pave between the rails and a distance of two (2) feet outside of each rail in the same form and manner that the streets of Shawnee are now paved by the said parties of the second part; * * * and whereas, the said Shawnee Light & Power Co., party of the first part hereto, is interested in procuring same to be done by the said parties of the second part hereto, and for the said Shawnee Traction Co.: Therefore, it is hereby agreed by and on the part of the Shawnee Light & Power Co. that the said parties of the second part hereto shall receive from the city of Shawnee each month, the sum of five hundred ($500.00) dollars, together with interest thereon at the rate of seven per cent. per annum from the tenth day of July, 1904, which sum shall be paid by said city to said parties of the second part or to their order, before any amount is paid to the said Shawnee Light & Power Co. * * * The mayor and the

city council are hereby directed to issue a warrant to the said parties of the second part, or to their order for the said payments as hereinbefore provided, and deduct the same from the amount due by the said city of Shawnee to the said Shawnee Light & Power Company."

A demurrer was filed to the petition by the Oklahoma Paving & Construction Company, and, on being overruled, an answer was filed in which was admitted the allegations set up in plaintiff's petition, except that portion which reads as follows:

"But that the said contract was *ultra vires* and void, and the said Shawnee Light & Power Company had no authority to enter into said contract, and the said Oklahoma Paving & Construction Company well knew that the said contract was *ultra vires* and void, and beyond the powers of the said Shawnee Light & Power Company, and there was no consideration for the said contract; the said Shawnee Light & Power Company not owing the said Oklahoma Paving & Construction Company any sum whatever."

It denied the allegation that said Shawnee Light & Power Company had no interest in having said paving done, and answered that the said Shawnee Light & Power Company was a Colorado corporation, and that section 3 of its articles of incorporation read as follows:

"Without in any particular limiting the powers and objects of the corporation, it is expressly declared and provided that the corporation shall have powers to guarantee any dividend on bonds, or contracts, or other obligations; to make and perform contracts of any kind and description; and, in carrying on its business or for the purpose of furthering any of its business, to do any and all other acts and things and to exercise any and all other powers which any person or corporation could do or exercise, and which now or hereafter may be authorized by law."

The material portion of the answer then continues:

"These answering defendants further allege: That the ordinance passed by the mayor and councilmen of the city of Shawnee authorizing and granting to the said Shawnee Traction Company the right and privilege to construct its line of street railway in said city contained a provision that the said Shawnee Traction Company, its successors and assigns, should keep the streets where it should be so constructed between the rails and two feet on each

side thereof, and maintain same in the same condition in which the remaining parts of the street adjacent thereto should be kept and maintained. That prior to paving that part of Main street between the rails of said street railway and two feet on each side thereof, the answering defendants entered into the contract with the said Shawnee Light & Power Company, a copy of which contract is attached to said petition. That the said Shawnee Traction Company had no means whatever with which to pay for the said paving which it was so required to do, ,and that the said Shawnee Light & Power Company, in order to enable the said Shawnee Traction Company to continue its business of operating said street railway and completing the same, in order that it might be able to carry out its said contract with the said Shawnee Light & Power Company, entered into said contract, whereby it agreed that the sum of $500 per month of the warrants to become due to it from the said city of Shawnee, should be paid and turned over to these answering defendants, as the Oklahoma Paving & Construction Company, to pay them for the cost and price of paving the above-mentioned part of Main street."

Also, that the said Shawnee Light & Power Company had a contract with the said traction company to furnish electric power to operate its street car line in and near the city of Shawnee at an advantageous price. As for the answer of the clerk and treasurer of the city, it suffices to say that it admits the allegations of plaintiff's petition.

Trial of the cause was had to the court which resulted in a judgment holding that "said contract the court finds to be *ultra vires* and void, and was not executed by any officer having authority to execute the same; that J. J. Henry, president of the Shawnee Light & Power Company, pretended to execute the said contract, and executed the same for the benefit of himself and another corporation of which he was also president and treasurer, to wit, the Shawnee Traction Company, all of which was known to the Oklahoma Paving & Construction Company, and that, the said contract being *ultra vires* and void, the said receiver was entitled to all of such warrants delivered by the said city clerk to the said Oklahoma Paving & Construction Company"—and rendered judgment making the temporary injunction perpetual, and ordering

defendant, the Oklahoma Paving & Construction Company and its members, Charles F. Derr, John A. Derr, and Frank A. Derr, to deliver to the receiver the six warrants which they had received under the contract with the Shawnee Light & Power Company, and requiring the city clerk to deliver to the receiver all warrants issued subsequent to November 2, 1904, due from the city of Shawnee for street lighting under the contract made by it with the Shawnee Light & Power Company, and the city treasurer was directed and ordered to pay the same to the plaintiff and enjoined from paying any portion thereof to any one else. Motion for new trial being overruled, the cause is before us by proceedings in error taken in the Supreme Court of the territory of Oklahoma.

*Shartel, Keaton & Wells* and *J. H. Woods,* for plaintiffs in error.

*D. T. Flynn, C. B. Ames, B. B. Blakeney,* and *J. H. Maxey, Jr.,* for defendant in error J. C. Fisher as receiver for the Shawnee Light & Power Company.

DUNN, J.(after stating the facts as above). Plaintiffs in error make three points in their brief: First. That the plaintiff below had an adequate remedy at law, and hence a suit in equity could not be maintained. Second. That the contract in question was not *ultra vires,* but one within the power of the Shawnee Light & Power Company to make. Third. That, if the contract in question was not one that the light and power company had power to make, it was estopped to take advantage of the lack of power for the reason that the contract had been fully executed by the paving company, and that the parties could not be placed by the court in *statu quo.* Both questions of practice involved in the foregoing statement are subsidiary to the main proposition involving the real question of merit in the case, to wit: Was the contract entered into by the Shawnee Light & Power Company in which it undertook to pay a sum of something like $8,000 to cover the cost of paving between the rails and two feet on each side thereof of the line of railway of the traction company *ultra*

*vires.* If this contract was *ultra vires,* then the other questions raised by counsel may require consideration, but, if the contract was within the powers conferred upon the Shawnee Light & Power Company under its articles of incorporation, then this will dispose of the entire case, except of the manner of its execution by the president of both the light and power company and the traction company, a question which is also raised in this connection.

It is the contention of counsel for the receiver that a contract such as is involved in this case would not be within the ordinary powers of a corporation organized under the statutes of Oklahoma Territory, and he invokes the rule that a foreign corporation may not do anything within the state which cannot be lawfully performed by a domestic corporation. Of course, broadly stated, a foreign corporation cannot enter a state and do things therein that the positive laws of the state forbid, nor which are against the established public policy of the state. The rule is stated in 3 Clark & Marshal on Private Corporations, § 838, as follows:

"The law of comity between states, however, does not require a state to allow a foreign corporation to do business or hold property within its limits, or require the courts to enforce its contracts made within the state, or otherwise recognize it, when to do so would either violate any express provision of the Constitution or laws of the state or be contrary to the principles of its common law, or contrary to its public policy as established or shown by the general course of its legislation or by the adjudications of its courts. It has been held, therefore, that a foreign corporation will not be allowed to come into a state and exercise powers which, although conferred upon it by its charter, are denied by the laws of public policy of the state to its own corporations, and, if it attempts to do so, the courts must refuse to recognize it, or to enforce its contracts."

The rule as declared by Beale on Foreign Corporations, § 113, is as follows:

"By the better opinion the mere fact that the Legislature has itself created no corporation, either by special charter or by general law, which has power to do the act in question, is not enough to prove that the doing of it by a foreign corporation is against

public policy. If such an act ·when done by a corporation is contrary to public policy, it must be so expressed in an affirmative statute."

Our statute upon the powers conferred upon organizations under the general laws of the state is found in article 3, c. 18, § 32, par. 961, Wilson's Rev. & Ann. St. Okla. 1903, and is as follows:

"Every corporation, as such, has power: First. To have succession by its corporate name, for the period limited; and when no period is limited, perpetually. Second. To sue and be sued; to complain and defend in any court. Third. To make and use a common seal, and alter the same at pleasure. Fourth. To purchase, hold, transfer and convey such real and personal property as the legitimate purposes of the corporation may require, not exceeding, in any case, any amount limited by law. Fifth. To appoint such subordinate officers and agents as the business of the corporation may require, and to allow them suitable compensation. Sixth. To make by-laws not inconsistent with the law of the land, for the management of its property, the regulation of its affairs, and for the transfer · of its stock. Seventh. To admit stockholders or members, and to sell their stock or shares for the payment of assessments or installments. Eighth. To enter into any obligations or contracts essential to the transaction of its ordinary affairs, or for the purposes of the corporation. In addition to the above enumerated powers, and to those expressly given in any other statute under which it is incorporated, no corporation shall possess or exercise any corporate powers, except such as are necessary to the exercise of the powers enumerated and given."

By this it will be seen that there is no affirmative limitation upon a corporation to make the specific contract here under discussion, and, if it is limited at all, that it is under the terms of ·the eighth subdivision of the paragraph. On the question of whether or not this constitutes a limitation to such an extent that the corporation is precluded from entering into this contract, we invite attention to the articles of incorporation, in which the purposes and objects of its corporate life are set out, and also to the construction of similar provisions in articles of incorporation of other concerns where they have been brought into question.

The objects and purposes for which the company was formed are set forth as follows:

"The objects and purposes for which our company is formed and created are as follows: To own, acquire, construct, maintain, equip, and operate buildings, machinery, and plants for the purpose of generating and supplying electricity and gas for illuminating, heating, and manufacturing purposes to other corporations, private and municipal, and to individuals; to generate and use electricity and gas for power, heating, lighting and all other lawful purposes, and dispose of the same to other corporations, private and municipal, and individuals in all such states and territories, in which said corporation shall do business, as may be permitted by the laws of said states and territories; to do and perform all things which may be requisite or necessary for carrying on the business of manufacturing, selling, and distributing electricity and gas for illuminating, heating, fuel, and other purposes; to issue its capital stock or bonds, notes, or other evidences of indebtedness in payment for any property acquired by the company, or in or about the carrying on of the business of the company, and to secure the payment of such notes, bonds or other evidences of debt by the mortgage or pledge of its property, either real or personal, and franchises; to buy, acquire, hold, own, sell, or mortgage all such lands or real property, rights of way, and other interests in land as may be proper, necessary or convenient for the conduct of the business of this corporation. To acquire and exercise such municipal franchises as may be necessary and requisite for the proper exercise of the powers and privileges hereby sought to be obtained. Without in any particular limiting any of the objects and powers of the corporation, it is hereby expressly declared and provided that the corporation shall have power to guarantee any dividends, or bonds, or contracts or other obligations; to make and perform contracts of any kind and description; and, in carrying on its business or for the purpose of attaining or furthering any of its objects, to do any and all other acts and things and to exercise any and all other powers which a copartnership or natural person could do and exercise, and which now or hereafter may be authorized by law."

It will be observed that in this case it is pleaded by the defendants that the light and power company had a contract with the traction company to furnish it with electric power to operate

its street car lines in the city of Shawnee at a profitable and advantageous rate and price, which contract was to continue for 20 years. On this proposition Mr. J. J. Henry, who was president and treasurer of each of the said corporations, testified that the purpose of executing the contract by the light and power company for the traction company was to assist the traction company in its financial affairs; and this would be of benefit to the light and power company as it had a power to contract with the traction company; that this was one of the reasons, and that the other reason was the threat of the mayor of Shawnee to vitiate the traction company's franchise if it did not carry out the paving; that the traction company had no funds with which to pay for this paving. The contract was entered into by the said J. J. Henry on the part of the light and power company, and was afterwards ratified as he testified by the board of directors.

Counsel for receiver cites the case of *Davis v. Old Colony Railroad Company*, 131 Mass. 258, 41 Am. Rep. 221, which he contends is conclusive of every question in this case. An examination of that case discloses that a railroad company and an organ company, both corporations, entered into an agreement with the promoters of a World's Peace Jubilee and International Musical Festival to be held in Boston, wherein they agreed that they would contribute towards any deficiency, should there be one, that might arise in defraying the expenses of such jubilee and festival. A deficiency arose, the companies refused to make payment, suit followed, and the Supreme Court of Massachusetts, by Mr. Chief Justice Gray, held:

"It is beyond the powers of a railroad corporation chartered by the Legislature, or of a corporation organized under St. 1870. c. 224, for the manufacture and sale of musical instruments to guarantee the payment of expenses of a musical festival; and no action can be maintained against either corporation upon such a guaranty, although it was made with the reasonable belief that the holding of the proposed festival would be of great pecuniary benefit to the corporation by increasing its proper business, and the

festival has been held and expenses incurred in reliance upon the guaranty."

Whether an act is *ultra vires*, and hence not enforceable against a corporation, depends in the first instance on its charter. Both of the corporations involved in that suit were domestic concerns. The terms of neither the statute under which they were organized nor their charters are set out, nor have we been able to find them, and hence we are unable to measure the facts in the case at bar by the law declared in that. If the act or their charters were more restrictive than we find here, then it is not a parallel proposition; but if otherwise, and the power granted was as extensive as that reported in the case at bar, then the authority is in point, but in our judgment it must be held to be against the weight of American case law on this point, as will be seen by the following decisions: *Whetstone v. Ottawa University,* 13 Kan. 320; *Sherman Center Town Company v. Russel,* 46 Kan. 382, 26 Pac. 715; *Vandell et al v. South San Francisco Dock Company,* 40 Cal. 83; *Temple Street Cable Railway v. Hellman,* 103 Cal. 634, 37 Pac. 530; *Steinway v. Steinway & Sons et al.,* 17 Misc. Rep. 43, 40 N. Y. Supp. 718; *Richelieu Hotel Company v. International Military Encampment Company,* 140 Ill. 248, 29 N. E. 1044, 33 Am. St. Rep. 234; *Toledo, Wabash & Western Railway Company v. Rodrigues,* 47 Ill. 188, 95 Am. Dec. 484; *McCrory et al. v. Chambers et al.,* 48 Ill. App. 445; *State Board of Agriculture v. Citizens' Street Railway Company,* 47 Ind. 407, 17 Am. Rep. 702; *Louisville & Nashville Railroad Company v. Literary Society of St. Rose, etc.,* 91 Ky. 395, 15 S. W. 1065; *McGeorge et al. v. Big Stone Gap Improvement Company* (C. C.) 57 Fed. 262; *Ft. Worth City Co. v. Smith Bridge Co.,* 151 U. S. 294, 14 Sup. Ct. 339, 38 L. Ed. 167. The case of *Whetstone v. Ottawa University, supra,* was one wherein a town company was organized, as set out in its charter, "for the purpose of locating and laying out a town site and make improvements therein." Under such charter, the officers of the said company donated 97 lots to the Ottawa University to enable that institution to com-

plete certain buildings then being erected near to, but outside the limits of the said town.    The decision was written by Justice Brewer, and the Kansas Supreme Court held:

"A donation of lots by a town-site corporation, with no special limitation on its powers, is not necessarily *ultra vires*.  Where the direct and proximate tendency of certain improvements sought to be obtained by the donation is the building up of the town and the enhanced value of the remaining property of the corporation, the donation is within the powers of the corporation, and this, though the improvements are to be made outside of the town site."

The case of *Sherman Center Town Company v. Russel, supra,* was another Kansas case wherein the construction of the charter of another town-site corporation was involved, and wherein certain lots and money were to be donated to one Russell in consideration of his removal to the said town.    The objects of the corporation were set forth as follows:  "For the purchasing of lands, the surveying and platting of town sites, and selling town lots and other lands."    The court, through Justice Johnston, in its consideration, says:

"The corporation may exercise, not only the powers expressly enumerated in its charter, if they are authorized by law, but 'may enter into any obligation or contract essential to the transaction of its ordinary affairs,' and incidental to the exercise of the powers expressly enumerated.    Gen. St. 1889, par. 1167."

It will be noted that the language used by the court above, "may enter into any obligation or contract essential to the transaction of its ordinary affairs," is the same language as is contained in our own statutes on that subject.    In the syllabus of that case the court held as follows:

"A contract entered into by a town company incorporated 'for the purchasing of lands, the surveying and platting of town sites and selling town lots and other lands,' in which it was agreed that, if R. would remove a bank, a barn, and a restaurant located elsewhere to the town site, the town company would convey to him certain lots in the town and pay him the sum of $1,000, tends directly to enhance the value of the remaining property of the corporation, and is not necessarily *ultra vires*."

The case of *Vandall v. South San Francisco Dock Company,* *supra,* was "brought to restrain the defendant from selling the shares of stock held by the plaintiffs under an assessment made by the trustees of the company. It appears from the certificate of incorporation that the corporation was formed 'to buy, improve, lease, sell, and otherwise dispose of real estate,' in and near, South San Francisco; 'also, to build water front protection, slips, docks, piers, wharves, warehouses, and otherwise improve such property as may be obtained by the company.' It further appears that the company purchased and owned a tract of land at or in the vicinity of South San Francisco, and that another corporation, known as the 'Potrero & Bay View Railroad Company,' had constructed or was engaged in constructing a railroad from the city of San Francisco proper to the vicinity of the defendant's property, and that an agreement was entered into between the defendant and the railroad company whereby the latter bound itself, within a stipulated period, to increase the width of its road and the frequency of the trips of its cars over it, and to reduce the price of passage over it about 50 per cent., and to maintain these conditions for a period of 10 years. The defendant on its part agreed to pay to the railroad company, as a consideration for these concessions, the sum of $20,000, and the assessments in question were levied by the trustees on the stock of the company for the purpose of raising a fund sufficient to pay this demand." The Supreme Court of the state of California held:

"Where a corporation is formed 'to buy, improve, lease, sell and otherwise dispose of real estate,' etc., the term 'improve' includes the performance of any act, whether on or off the land, the direct and proximate tendency of which is to benefit the property or enhance its value. No infallible rule can be laid down defining accurately the point at which the benefit to be derived from a proposed work would cease to be direct and proximate, but each case must be determined on its own circumstances. A corporation formed for such purposes, and owning lands in the vicinity of a railroad, may properly appropriate a portion of its funds to such railroad for the purpose of increasing the facilities and

lessening the cost of transportation on the same, where the direct and proximate tendency of such increase of facilities is to enhance the value of its lands."

The case of *Temple Street Railway v. Hellman, supra,* was one wherein a street railway company at Los Angeles, for the purpose of increasing the traffic on its road, executed its negotiable promissory note for $5,500, the consideration being that a conductor of a baseball park, Hellman, should discontinue the playing of baseball at one park and maintain a ball park on a tract of land adjacent to plaintiff's line, further agreeing to pay to plaintiff 10 per cent. of the gross receipts for admissions. Hellman and the other defendants in the cause gave plaintiff a bond in the sum of $7,000 conditioned for the faithful performance by him of the principal contract, and, in case of any violation of any of its stipulations, to save the plaintiff harmless on account of its promissory note. This contract was violated, and the railroad company brought suit on the bond. On a defense being made that the note was *ultra vires,* the court held that the giving of its note by plaintiff was not *ultra vires;* the object being to increase its legitimate business. The syllabus to the case on this point reads as follows:

"A street railway corporation has power to execute a note to the conductor of a baseball park in consideration that he will discontinue his former place of business, and establish a first-class baseball park on a tract of land adjacent to the land of the street railway, with a view to increase its business."

The case of *Steinway v. Steinway & Sons et al., supra.,* was one wherein "it appears that the company was incorporated in 1876, under the general manufacturing act of this state [New York], for the purpose, as expressed in the certificate of incorporation, of manufacturing and selling pianofortes and other musical instruments. At that time the business was one of large proportions, which had for many years been conducted by the Steinway family as a copartnership, and the change which was effected by the incorporation was one of form rather than of substance. It continued to be the same in its object and purpose, and under sub-

stantially the same ownership and control." Under this incorpora-
tion it undertook to purchase and hold a large tract of land and
to erect thereon factories and residences for its employes, and to
contribute for the establishment thereon of a church, a school, a
free library, and a free bath for its employes. In addition to
this, the corporation was in the habit of giving away pianos for
the purpose of extending the reputation thereof. On a controversy
arising between the stockholders over this manner of divesting the
funds of the corporation to these purposes, the Supreme Court of
the state of New York by Beekman, J., said:

"The general rule of law undoubtedly is that a corporation
must keep within the prescription of its charter. The difficulty,
however, which arises, and which has given birth to the many de-
cisions upon the subject, to some extent conflicting, is in the ap-
plication of the rule to individual cases, so that the question is
mainly one of construction. 27 Am. & Eng. Ency. Law, 355,
where it is also said: 'It may be stated as a general rule that the
charter of a corporation, read in connection with the general laws
applicable thereto, is the true measure of its powers, and a trans-
action manifestly beyond those powers is *ultra vires;* yet whatever,
under the charter and general laws, reasonably construed, may
fairly be considered as incidental to the purposes for which the
corporation was created, is not to be taken as prohibited, but is as
much granted as that which is expressed.' It is a question, there-
fore, in each case, of the logical relation of the act to the corporate
purpose expressed in the charter. If that act is one which is law-
ful in itself, and not otherwise prohibited, is done for the pur-
pose of serving corporate ends, and is reasonably tributary to the
promotion of these ends in a substantial, and not in a remote and
fanciful, sense, it may fairly be considered within charter powers."

The court held in the syllabus:

"It is not *ultra vires* for a manufacturing corporation to pur-
chase a large tract of land for the purpose of erecting thereon
its factories and residences for its employes, and to contribute to-
wards the establishment there of a church, a school, a free library,
and a free bath for its employes, * * * nor for a manufactur-
ing corporation to give away some of its manufactured goods for
the purpose of extending the reputation thereof."

The case of *Richelieu Hotel Company v. International Mili-*

*tary Encampment Company, supra,* was one wherein a hotel in the city of Chicago made a subscription with the view of securing an international military encampment at that city. On its refusal to pay the same, action was brought against it, and defense was made on the ground that the contract was *ultra vires.* The charter set forth its business as being "to conduct a general hotel business." In the discussion of this proposition, Mr. Justice Bailey, who delivered the opinion of the court, said:

"It is urged that said subscription by the defendant is *ultra vires.* It may be inferred from the name of the defendant corporation that it was organized for the purpose of maintaining and operating a hotel. It also appears from those portions of the defendant's certificate of incorporation read in evidence that the object for which it was incorporated was 'to conduct a general hotel business.' In our opinion a subscription for the purpose for which the one in question was made was not beyond the corporate powers as thus shown. The establishment and holding in or near the city of Chicago of an international military encampment upon the plan proposed by the plaintiff was a scheme likely to bring to the city large numbers of strangers, who while in the city would necessarily require hotel accommodations, and would thus largely increase the patronage of the various hotels in the city, the defendant's among the rest. Power to carry on the hotel business necessarily carries with it, as an incident, the power to adopt and promote all reasonable expedients directly calculated to increase the number of patrons of the hotel, such as advertising, employing agents to solicit patronage, running omnibuses and other vehicles to convey guests to and from the hotel, and other similar expedients. Donations of money to enterprises calculated to bring to the city large numbers of visitors from abroad would seem to fall within the same reason."

The syllabus to the case is as follows:

"A subscription by an incorporated hotel company to a contemplated corporation for the purpose of establishing and holding in or near a city in which the hotel company is located and transacts its business, an international military encampment, which might bring large numbers of strangers to the city and thus largely increase the business of all the hotels therein, is not so foreign to

the business of keeping hotels as to call for the application of the doctrine of *ultra vires*."

This case received further consideration at the hands of the Appellate Court of that state in *McCrory v. Chambers, supra,* which was one wherein a national bank sought to make a donation of its funds for the purpose of inducing a manufacturing company to remain in its city. Those who sought to sustain the donation cited the case of *Richelieu Hotel Company v. International Military Encampment Company, supra,* and the court in holding that a bank was not liable on such a subscription drew the distinction generally recognized by most of the authorities in this class of cases, as follows:

" 'We understand the rule to be that corporations have such powers as are expressly given them by the law which authorizes their creation, and such other powers as are necessarily incidental to the proper exercise of such express powers. The express powers are readily ascertained from the statute of the charter of the corporation. The right to make donations of money is not among them.' 'The directors [of a national bank] can use the funds and property of the bank only for proper banking purposes, and for the strict furtherance of the business objects and financial prosperity of the corporation. They cannot use any portion of the money for objects of usefulness or charity or the like, however worthy of encouragement or aid. They cannot make gifts from the corporate funds. All their transactions must be strictly matter of business.' 1 Morse on Banks and Banking, § 127, pp. 258, 259. The incidental powers are such as are necessary to the efficient exercise of the express powers. A donation of the funds of a bank is *prima facie* unauthorized. Such power is not expressly given, nor is it apparent, in the absence of proof of special circumstances, that it is necessary to the proper and successful exercise of any express power. The donation by the Richelieu Hotel Company to a fund raised for the particular purpose of bringing together in or near to the city a large number of persons, who would necessarily need hotel accommodations, was deemed by the Supreme Court so clearly intended and likely to advance the financial interests of the hotel company that it was but a judicious exercise of power incidental to the general power given that corporation 'to conduct a general hotel business.' "

The case of the *State Board of Agriculture v. Citizens' Street Railway Company, supra,* was one wherein the railway company, as an inducement to the Indiana Board of Agriculture to locate the Indiana State Fair at the city of Indianapolis for three years, agreed to pay the sum of $1,000. On the carrying out of the engagement by the State Board of Agriculture, the railway company refused to make payment, contending that the subscription was *ultra vires* its charter. The acts under which this corporation was organized are set forth in the opinion as follows:

"The first section of the act of June 4, 1861. (Act 1861 [Sp. Sess.] p. 75), authorizes the formation of a corporation of this character, 'for the purpose of constructing, owning, and maintaining street or horse railroads, switches, or side tracks upon and through the streets of the cities or towns within the state.' The third section provides: 'The said company shall be capable of purchasing, holding, and conveying any real or personal property whatever necessary for the construction and equipment of the road, switches, and side tracks, and for the erection of all necessary buildings and yards, and may buy, own, and sell any kind of property that may be necessary to properly conduct or carry on the business of such road.' Section 6 of the same act authorizes the company to 'borrow such sums of money as may be necessary for completing or operating their railroad,' and authorizes the corporation to raise the money by issuing bonds secured by a mortgage of its corporate property and franchises. The act of March 6, 1865 (Act 1865, p. 63), authorizes such companies to extend their roads beyond town and city limits, and authorizes them to use public highways upon the conditions and subject to the regulations therein prescribed. The act of February 28, 1867 (Act 1867, p. 162), authorizes such companies to raise funds to discharge the indebtedness of such companies by making a *pro rata* assessment against stockholders, and to make needful rules in relation thereto," etc.

By these sections of the statute it will be observed that while the power to make this contribution is not found within them, still there is nothing therein which prohibits the company from doing this act, and the court in consideration of the same said:

"It is not claimed in the case under consideration that there

was any statute by which the street railway company was prohibited from entering into the contract in question; or, in other words, that in making the contract that company violated any statute by which the act was prohibited.    All that is claimed is that there was a want of power on the part of the corporation to bind itself by the contract.    It is fully shown on the part of the plaintiff that the State Board of Agriculture  performed the  contract on its part.    The street railway company has thus received the benefits and advantages of the contract, but seeks to avoid paying the consideration promised, because it had not the legal power to contract for the benefits which it has actually received.    In our opinion the street railway company is not at liberty to assume this position.    It has received the profits resulting from the compliance of the plaintiff with the contract.    These profits, we are at liberty to presume, have gone to swell the dividends of the stockholders in that corporation.    It would be unjust for their company now to escape performance  of the contract by which these profits have been realized."

The syllabus to the case is as follows:

"It is the general doctrine that corporations possess the powers expressly conferred by law, and such implied powers as are necessary to enable them to exercise the powers expressly granted and no others; yet, although there may be a defect of power in a corporation to make a contract, if a contract made by it is not in violation of the charter of the corporation or of any statute prohibiting it, and the corporation has by its promise induced a party, relying upon such promise and in execution of the contract, to expend money and perform his part of the contract, the corporation is liable on the contract."

The case of *Louisville & Nashville Railroad Company v. Literary Society of St. Rose, etc., supra,* was a case where two incorporated literary societies made a subscription to a railroad company to induce it to build its line of railroad to the city where they were located.    Their charter provided that they were established for the purpose of "sustaining and carrying on said institution of learning, and not otherwise," but by it they were allowed to buy and sell real and personal property for such purpose. They possessed a large and valuable farm and the building of the

railroad was highly necessary for their convenience. Payment of these subscriptions was refused, and, on suit being brought, the Court of Appeals of Kentucky, which is the highest court of that state, held:

"Corporations have such powers as are expressly given them by their charters, or such as, by fair implication, are necessary to the execution of their object. An incorporated literary institution, which, by its charter, has power to contract and buy and sell real and personal property for the purpose of 'sustaining and carrying on said institution of learning, and not otherwise,' and which, under the power thus conferred, owns and operates a large and valuable farm, has by fair implication the power to do anything reasonably calculated to add to the value of its property, or to the value of the large industry thus created. Therefore a subscription by the corporation to aid in building a railroad, which was highly beneficial to the institution in various ways, and added largely to the value of its property, was not *ultra vires.*"

In the case of *McGeorge et al. v. Big Stone Gap Improvement Company, supra,* the syllabus states the proposition involved as follows:

"The Big Stone Gap Improvement Company, which was organized by Act Va. Feb. 14, 1888 (Acts 1888, p. 136, c. 121), to buy and sell lands, erect, sell and lease buildings, to grade and improve streets, to furnish gas, electric light, and waterworks, to construct and operate street railways, furnaces, and mills, and to acquire by purchase or subscription the stock or bonds of any mining, manufacturing, water, gas, street railway, or other improvement company, has power to give part of its stock to a railway company in order to enable the latter to complete its line to the property of the Big Stone Gap Improvement Company."

The case of *Ft. Worth City Company v. Smith Bridge Company, supra,* was one wherein the Smith Bridge Company, an Ohio corporation, brought its action against the Ft. Worth City Company, a Texas corporation, in which it was alleged that the defendant had entered into a contract with plaintiff, in which, for a consideration of $8,166.66, plaintiff agreed to build a bridge across the Trinity river near Ft. Worth. It was further averred that the contract price of the bridge was $24,500, and that the

city of Ft. Worth and the county of Tarrant each had agreed to pay one-third of the price; that the bridge was constructed according to the contract; that the consideration to be paid by the Ft. Worth City Company was contracted to be paid in the first mortgage bonds of that company and the North Side Street Railway Company; and that the defendant had failed and refused to deliver the bonds in accordance with its contract. The defendant answered by a demurrer and special exception, alleging among other things that the petition "did not disclose the purposes for which the two corporations were incorporated; nor any power or authority in the defendant to use its funds and property for the purpose of constructing the bridge"; also, that the contract sued on was without authority on the part of the board of directors and officers of the Ft. Worth City Company, which was organized "for the purchase, subdivision, and sale of land in cities, towns, and villages," under the provisions of title 20 of the Revised Statutes of Texas of 1879; that the bridge was to be and was built for the use and benefit of the general public on one of the public streets of the city, and was not under defendant's control or owned by it; that defendant company was not to have and did not have any property in the same or other right to use the same than such as the public in general had; that, therefore, the contract was illegal and unauthorized. Defendant further stated "that the sole and only benefit it ever expected to derive from the construction of said bridge was the enhancement of its property by making it more convenient of access and so more readily saleable." It was further shown in pleadings that the defendant owned a large tract of land on the north side of Trinity river over which the bridge was built; that said land was then subdivided into lots and was then being offered for sale; that the river separated the land from the city of Ft. Worth; that it was necessary, in order to accomplish a ready sale of the lands, that the company have means of access from the city thereto, and that the company had this object in view when it made the contract with the plaintiff;

that the erection of the bridge afforded such means of access from the city to the lands, and immediately upon the completion of the bridge the North Side Street Railway Company constructed across the bridge a railway connecting the city of Ft. Worth with the said lands. It was further alleged that the stockholders of both the companies were for the most part the same; that, by reason of the erection of the bridge and the operation of the street railway, the value of the lots was greatly enhanced and the sale thereof was promoted. The special findings of the court were substantially in accordance with the foregoing statement: *it being found, in addition, that the president and secretary of the defendant corporation owned together 88 per cent. of its stock, and also owned the same per cent. of stock in the North Side Railway Company*; "that the said bridge was to be and is a part of a public street of the incorporated city of Ft. Worth, and the defendant was not to have nor has it ever had any property interest in or control over the same or use of it, except as a part of the general public"; that the bridge, when completed and turned over to the said city, was in substantial compliance with the contracts mentioned; that the defendant had refused to deliver the bonds as agreed, and the trial court on these facts concluded "that the defendant had the power to make the contract sued on, and that the same is therefore legal, valid, and binding upon it."

The purpose and object of the defendant corporation, as set forth in its charter, were "for the purchase, subdivision, and sale of land in cities, towns, and villages." The general power granted corporations under the incorporation act of Oklahoma (section 8, par. 961, *supra*,) is that "it may enter into any obligations or contracts essential to the transaction of its ordinary affairs, or for the purposes of the corporation." Article 575 of the Texas statute, under which this corporation was incorporated, provided that every corporation as such has the power "to enter into any obligation or contract essential to the transaction of its authorized

business." The similarity of these provisions is apparent at once, and shows that under this authority the Oklahoma provision is not susceptible to the construction that the power to make this contract is denied. Under this Chief Justice Fuller of the Supreme Court of the United States, construing the contract and law applicable in that case, says:

"The general rule is that corporations have only such powers as are granted and the powers incidental thereto, and, in arriving at a conclusion as to the powers of this corporation, the applicable provisions of the title under which it was organized must be considered, legislation which will be found to be in harmony with the common law. Article 575 provided that every private corporation as such has power 'to enter into any obligation or contract essential to the transaction of its authorized business,' and article 589, that 'no corporation created under the provisions of this title shall employ its stocks, means, assets, or other property, directly or indirectly, for any other purpose whatever than to accomplish the legitimate objects of its creation.' Sayle's Civ. St. (Tex.) arts. 217, 219. In *Green Bay & Minnesota Railroad v. Union Steamboat Co.,* 107 U. S. 98, 100, 2 Sup. Ct. 221, 223, 27 L. Ed. 413, it was said: 'The charter of a corporation, read in connection with the general laws applicable to it, is the measure of its powers, and a contract manifestly beyond those powers will not sustain an action against the corporation. But whatever, under the charter and other general laws, reasonably construed, may fairly be regarded as incidental to the objects for which the corporation is created, is not to be taken as prohibited.' This corporation was formed under a general law, containing, in addition to the provisions for the creation of such a corporation, the other provisions we have quoted. The question of power is reduced, therefore, to this: Whether a corporation created for the purpose of dealing in lands, and to which the powers to purchase, to subdivide, and to sell, and to make any contract essential to the transaction of its business, are expressly granted, possesses as fairly incidental the power to incur liability in respect of securing better facilities for transit to and from the lots or lands, which it is its business to acquire and dispose of. We entertain no doubt that under these findings the defendant company possessed the power to enter into the contract in question; and that the contract hav-

ing been fully performed by the bridge company, and the defendant company having the full benefit thereof, the latter cannot now be allowed to say that the power was not properly exercised."

To epitomize, let us ask if a town-site corporation, organized "for the purpose of locating and laying out a town site and make improvements therein," may make a donation of its lots for the construction of a school building outside its limits; and if another such corporation, organized for the purpose of "purchasing lands, the surveying, and platting of town sites and selling town lots and other lands," may make a contract for a donation of lots and money to induce an individual to settle in its town; and if a concern, incorporated "to buy, improve, lease, sell, and otherwise dispose of real estate, in and near South San Francisco, to build water-front protection, slips, docks, piers, wharves, warehouses, and otherwise improve such property as may be obtained by the company," may properly appropriate a portion of its funds to assist in the construction of a railroad; and if a street railway company with a view of increasing its business may make a contribution to the conductor of a baseball park in consideration of his discontinuing his former place of business and establishing a similar park on the land adjacent to the said railway company; and if a corporation, organized for the purpose of "manufacturing and selling piano-fortes and other musical instruments," may contribute of its property to purchase a tract of land for the purpose of erecting thereon its factories, residences of employes, and contribute towards the establishment of a church, school, free library, and free bath for the use of its employes; and if a hotel company, organized "to conduct a general hotel business," may contribute of its funds to induce the holding of an international military encampment near it; and if a street railway company, organized "for the purpose of constructing, owning, and maintaining street or horse railroads, switches, or side tracks, upon and through the streets of the cities or towns within the state," may make a contribution for the purpose of inducing a state fair to be

held at the city of its location; and if a literary society, empowered to buy and sell real and personal property for the purpose of "sustaining and carrying on said institution of learning, and not otherwise," may contribute of its funds to induce the building of a railroad to its real property; and if a corporation, organized "for the purchase, subdivision, and sale of land in cities, towns, and villages," may contribute for the building of a bridge on the public highway to be owned and used by the public—does it not follow that a corporation organized for the purposes of the Shawnee Light & Power Company, whose articles of incorporation prescribe that it may, "make and perform contracts of any kind and description, and in carrying on its business or for the purpose of attaining or furthering any of its objects to do any and all other acts and things, and to exercise any and all other powers which a copartnership or natural person could do and exercise, and which now or hereafter may be authorized by law," and which having a contract for furnishing a traction company at a profitable and advantageous rate and price with power for a period of 20 years, could subscribe to assist the said traction company in complying with the imperative duties imposed upon it under the terms of its franchise? It is argued on the one side that the contract in this case would be detrimental to the light and power company. On the other hand, it is argued that it might be a profitable one to it and some of the cases cited seem to go off with this as the controlling consideration, but to our minds this does not touch the real question involved. It may be that a contract would be highly profitable to a corporation and yet *ultra vires*. It may be disastrous and be *intra vires*. The profit or lack of profit does not determine the legality of a contract, but whether or not the power to make the contract is within the language of the charter, or is not denied by statute. That a contract reasonably germane is profitable may be good argument why it ought not be *ultra vires,* but it is only argument. It is not conclusive nor controlling upon a court. Such a question addresses itself to the business judgment

of the officers of the concern.   This question here addresses itself
to the judicial determination of the power of the corporation to
be ascertained by weighing in the terms of the charter and statute
the act in question.   It is difficult to conceive of the rights con-
ferred upon a corporation broader than those granted under this
charter; but, there being no statute of the territory denying to it
the right to exercise the powers granted, the contract must be held
valid.   Should it be thought to be in any way involved and urged
that the contract was without consideration to the light and power
company by virtue of the fact that no new thing of value came to
it under its terms, the answer must be, the paving company
having acted under it, having constructed the pavement, parted
with its property, that this in itself would be sufficient consider-
ation to support it; the principle being that the consideration may
consist either of a benefit to the corporation or of a prejudice or
disadvantage to the other contracting party.   If the corporation
secures what it contracted for, and the other party acts upon the
contract to its disadvantage, as where it expends money on the
faith of it, the contract will be enforceable.

We are asked to say that the contract was not executed by the
proper party; that by reason of the fact that J. J. Henry was presi-
dent of both the light and power company and of the traction
company, and owned a majority and controlling interest of the
stock of each of the concerns, that he could not enter into this
contract; that it would be against public policy to allow him to do
so, and our attention is called to a number of cases, all of which
we have examined, which go to the point of holding that an officer
of a corporation may not deal with himself and appropriate the
funds and assets of the concern of which he is an officer to his
own use or to the liquidation of his own indebtedness, and bind
his principal.   While we do not believe that this principle is fully
applicable to the situation presented by the facts in this case, it
might be more so were it not a fact that the uncontroverted evi-
dence is that the board of directors of the light and power com-

pany subsequently ratified the actions of its president. This conclusion renders the discussion of the other questions raised unnecessary.

The decision of the district court of Pottawatomie county is accordingly reversed, and the case is remanded with instructions to set aside the decree and judgment heretofore rendered and enter one in accordance with this opinion.

Turner, J., concurs; Hayes and Kane, JJ., and Williams, C. J., concur in conclusion reached.

---

## On Rehearing.

Dunn, J. In the consideration of this case and in the opinion rendered, no thought was given to the question of whether or not the receiver was bound by the contract entered into between the Shawnee Light & Power Company and the Oklahoma Paving & Construction Company; the issue being tried out on both sides on the question of the validity of the contract and the liability of the Shawnee Light & Power Company on the same. We held the contract valid between the parties, and that under its terms a liability was created against the Shawnee Light & Power Company; and the propositions urged in the petition for rehearing do not convince us that there was error in such holding. We have, however, now pressed upon our attention in the petition the proposition that our opinion is susceptible to the construction that the liability created under this contract is likely to be given a preferred standing over other obligations of the Shawnee Light & Power Company, coming to the receiver's hands when he took possession of the concern, as the court finds he did on November 10, 1908. We did not intend to so hold. The Oklahoma Paving & Construction Company should be permitted to receive from the Shawnee Light & Power Company and from its customer, the city of Shawnee, all the contract called for to the date the company was

taken charge of by the receiver, but an obligation to the construction company on the part of the Shawnee Light & Power Company was no other or different than an obligation of this concern to other parties with which it had dealt, and its claim against the insolvent concern should receive at the hands of the receiver the same consideration that all other claims of its class and character receive.

Let the mandate issue.

All the Justices concur.